**CONSOLIDATED RAIL CORPORATION,**
Plaintiff,

v.

**The PENN CENTRAL CORPORATION and the Michigan Central Railroad Company, Defendants,**

v.

**CANADA SOUTHERN RAILWAY COMPANY, United States Railway Association, and the United States of America, Counterclaim Defendants.**

Civ. A. No. 83–11.

Special Court,
Regional Rail Reorganization Act.

Jan. 24, 1984.

As Clarified on Reconsideration of Opinion, March 1, 1984.

Thomas E. Zemaitis, Philadelphia, Pa. (Laurence Z. Shiekman, Pepper, Hamilton & Scheetz, Philadelphia, Pa., of counsel), for plaintiff Consolidated Rail Corp.

Paul R. Duke, Washington, D.C. (James R. Stirn, Covington & Burling, Washington, D.C., Robert J. Siverd, The Penn Central Corporation, New York City, James E. Howard, Kirkpatrick, Lockhart, Johnson & Hutchison, Pittsburgh, Pa., Duncan Finlayson, Gerald C. Hollyer, Kingsmill, Jennings, Toronto, Ontario, of counsel), for defendants The Penn Cent. Corp. and The Michigan Cent. R. Co.

Frederick J. Berman, New York City, (E. Roger Frisch, Walsh & Frisch, New York City, of counsel), for counterclaim defendant The Canada Southern Ry. Co.

Alan Kleinburd, Washington, D.C. (Frazer C. Hilder, U.S. Ry. Ass'n, Washington, D.C. and J. Paul McGrath, Asst. Atty. Gen. and Jane A. Restani, Atty., Civ. Div., Dept. of Justice, Washington, D.C., of counsel), for counterclaim defendants U.S. Ry. Ass'n and U.S.

Before FRIENDLY, Presiding Judge, and WISDOM and THOMSEN, Judges.

FRIENDLY, Presiding Judge:

This case presents two different controversies, whose common thread is that both involve interests in Canada Southern Railway Company ("CSR") or its rail properties. We shall refer to them as the Conrail–PC controversy and the PC–CSR controversy.

### The Pleadings and Motions

The Conrail-PC controversy is presented by the complaint of Consolidated Rail Corporation ("Conrail") against The Penn Central Corporation ("PC") and its wholly-owned subsidiary, The Michigan Central Railroad Company ("MC"), the portion of the latters' answer addressed to the complaint, and Conrail's motion under F.R. Civ.P. 12 for judgment on the pleadings.

Conrail's complaint begins by setting forth the identity of the parties and our jurisdiction over the action as one arising under § 209(e)(2) of the Rail Act concerning the interpretation and implementation of our order of March 31, 1976, which directed the trustees of PC's predecessor, Penn Central Transportation Company ("PCTC") and the trustee of MC to convey their interest in certain Canadian properties to Conrail. The complaint then proceeds as follows:

The Final System Plan ("FSP") designated for transfer by PCTC and MC the rail properties in Canada owned by CSR, their partly-owned subsidiary, in fee to Conrail; if the properties could not be so transferred, the FSP designated for transfer to Conrail the stock and leasehold interests of PCTC and MC in CSR. FSP, Vol. I, 262, 264. The Official Errata Supplement restated those designations by saying that stock interests included "any interests of the transferor as creditor of the entity in which the stock interest is being transferred." Official Errata Supplement 8. In its Notice of Supplemental Designations pursuant to § 208(d)(3) of the Rail Act, published at 41 Fed.Reg. 8847 (March 1, 1976), the United States Railway Association ("USRA") specifically stated:

> Pursuant to this designation the matured bonds of the Canadian Southern Railroad held by the Penn Central Transportation Company (PCTC) and the advance to Canada Southern Railroad held by the Michigan Central Railroad (Michigan Central) are specifically designated to the Corporation subject to the above condition [*i.e.*, that any collections by or distributions to Conrail with respect to these creditor interests shall be for the account of the transferor] should the Corporation seek to collect rather than cancel such obligations.

On March 31, 1976, this court entered an "Order of Conveyance to Trustees of Railroads in Reorganization in the Region (Canadian Properties)" which incorporated the FSP, the Official Errata Supplement and the Notice of Supplemental Designations and ordered the trustees of PCTC and MC to assign to Conrail their leasehold interest, stock, "gold bonds" and the advance,[1] subject to the condition mentioned above, namely, that any distributions or collections with respect to the creditor interests assigned would be for the account of the

---

1. CSR had issued a quantity of the "gold bonds" in 1912, the bonds to mature in 1962. As of June 1, 1959, PC and MC held, respectively, one-third and two-thirds of the bonds. On that date CSR and MC, both then under PC's control, entered into an agreement that the principal amount of the bonds held by MC would be treated as an interest-free advance to CSR, still evidenced by the bonds, which were marked "cancelled". PC has taken no steps to enforce its rights under the matured bonds in its hands.

assignor. The trustees executed assignments accordingly.

As a part of a settlement agreement between the trustees of PCTC and Conrail in or about July 1978, PCTC agreed to transfer to Conrail and to cause MC to assign to Conrail their rights with respect to any collections or distributions on the gold bonds and the advance. This agreement was approved by PCTC's reorganization court on August 11, 1978, and the assignments were duly made.

The complaint further alleges that despite Conrail's legal and beneficial ownership of the bonds and advances, PC and MC retain physical possession of the uncanceled gold bonds and any instruments evidencing the advance, including the canceled gold bonds. Conrail claims that it requires the bonds and the instruments in order to close an agreement dated April 18, 1983, for the sale of all its interests in CSR to the Canadian National Railways and Canadian Pacific Limited. It seeks an order declaring that it is entitled to immediate physical possession of all the gold bonds and any such other instruments as may represent the advance and directing PC and MC to make immediate delivery of possession.

The relevant portions of PC's and MC's answer claim that PC has been retaining possession of the bonds, which are in bearer form, "in order to protect [their] position with respect to such bonds in connection with certain litigation" instituted by CSR in the Supreme Court of Ontario, Canada, for an accounting for various misdeeds allegedly committed by MC and PC as lessees of CSR.[2] The answer further alleges that PC has advised Conrail that it would turn over the gold bonds to Conrail if Conrail and CSR, now Conrail's 71%-owned subsidiary, "would execute an agreement protecting the interests of [PC and MC]" in the Canadian litigation.

Conrail thereupon moved under F.R. Civ.P. 12 for judgment on the pleadings. The motion argued that the only defense asserted by PC and MC was their alleged entitlement to retain the gold bonds to pro-

tect their interests in CSR's Canadian suit but that the original 1976 assignments of the creditor interests and the subsequent 1978 assignments of the right to receive collections or distributions in respect thereof were complete and unconditional.

The PC–CSR controversy is set forth in a counterclaim of PC and MC. This begins by identifying as "counterclaim defendants" CSR, USRA and the United States, the latter because of their having been parties to the settlement, dated November 16, 1980, of the claims of PC, MC and other PC subsidiaries in the valuation proceedings conducted by this court. Jurisdiction is predicated on §§ 209(b) and 209(e)(2) of the Rail Act. The counterclaim recites a 999 year lease, dated August 15, 1903, of CSR's rail properties to MC, which on January 2, 1930, leased substantially all its properties to the New York Central Railroad Company, which was merged into PCTC on February 1, 1968. It alleges, in somewhat greater detail than the complaint, CSR's issuance of the gold bonds which were guaranteed by MC, with MC paying the interest as rent; New York Central's acquisition of $10,055,000 of such bonds in bearer form by purchases on the open market; MC's similar acquisition of $19,261,500 of such bonds; the agreement between MC and CSR that this amount should be treated as a non-interest bearing advance; and PCTC's ownership, on March 31, 1976, of 107,163 shares, or approximately 71% of CSR's common stock. The counterclaim sets forth the transactions of March 31, 1976, to substantially the same effect as the complaint.

The counterclaim then alleges that, after an abortive attempt at arbitration, CSR, on June 1, 1979, initiated an action against PC and MC in the Supreme Court of Ontario alleging, *inter alia*, that the assignments to Conrail as of April 1, 1976, pursuant to the Rail Act, effected a termination of the Canada Southern Lease with respect to [MC and PC], thereby requiring an accounting by them to Canada Southern.

---

**2.** As appears below, MC was the lessee from 1903 to 1930, at which time MC leased its lease-

hold to the New York Central Railroad Co., which was merged into PC on February 1, 1968.

CSR has sought damages in excess of $200,000,000, and PC and MC have asserted the amounts represented by the gold bonds and other instruments as a counterclaim. PC and MC allege that for many years CSR showed on its books the amounts owing to PC and MC on account of the gold bonds and the advance as net amounts after deduction of amounts owed by PCTC and MC to CSR, and that the assignments transferred to Conrail only the net amounts owing to PC and MC over and above any amounts owed by them to CSR.

The counterclaim asserts that the assignments by the trustees of PCTC and MC of their leasehold interests in CSR did not effect a termination of the CSR lease but merely substituted Conrail as lessee. It also alleges that neither Conrail nor CSR has been willing to acknowledge this. The counterclaim finally alleges the settlement agreement dated November 16, 1980, between PC and MC, on the one hand, and the United States and USRA on the other, but says that this did not release

> [a]ny claim by any Penn Central Transferor against either of the Government Parties or Conrail by Penn Central and Michigan Central Railroad Company ("Michigan Central") of stock of The Canada Southern Railway Company ("Canada Southern"), or on account of the assignment to Conrail by Penn Central and Michigan Central of their leasehold interests in the property of Canada Southern, to the extent such claim arises on account of the recovery of money by Canada Southern on its claims (filed against Penn Central and Michigan Central in the Reorganization Court, and in the Supreme Court of Ontario, or in any other proceeding in any other forum including arbitration panels) seeking amounts allegedly owed to Canada Southern by Penn Central and Michigan Central because of the alleged termination of their leasehold interests in Canada Southern upon the transfer of those interests to Conrail as of April 1, 1976.

The counterclaim concludes by seeking a declaration that the transfer of March 31, 1976 "did not cause a termination of the Canada Southern Lease, and that the lease remains in effect in accordance with its terms."

Conrail's motion under F.R.Civ.P. 12 for judgment on the pleadings with respect to the complaint also sought a dismissal of the counterclaim. The motion contends that the legal effect of the assignment of defendants' leasehold interests in CSR to Conrail "is an issue entirely separate and distinct from the issues presented by Conrail's complaint, which is addressed solely to the assignment of defendants' creditor interests in CSR to Conrail"; that the legal effect of the assignment of defendants' leasehold interests on CSR's right to demand an accounting under the leases is a matter solely between defendants and CSR which is already being litigated in the action brought by CSR against defendants in the courts of the Province of Ontario; that since defendants' claim for declaratory relief as set forth in the counterclaim is not against Conrail, it cannot be maintained as a counterclaim in this action; and that any claims by defendants against Conrail which may result from defendants' being obligated to pay amounts to CSR in the Canadian litigation are not yet ripe.

CSR also moved to dismiss the counterclaim and submitted a supporting memorandum and an affidavit of its counsel, E. Roger Frisch, accompanied by numerous exhibits. The United States and USRA filed a motion to the same effect. PC and MC submitted a memorandum replying to Conrail's motion for judgment on the pleadings under Rule 12 and the three motions to dismiss the counterclaim. A copy of the 1903 lease from CSR to MC, and other papers, including an affidavit of Canadian counsel representing PC and MC to the effect that many of CSR's claims in the Canadian litigation necessarily assert the termination of the lease, were attached. Conrail and CSR filed reply memoranda. Attached to Conrail's memorandum was an affidavit of PCTC's Controller submitted to the reorganization court in support of the settlement agreement with Conrail in 1978, which characterized the elimination of the "pass through" rights with respect to the

gold bonds and the advance in a manner alleged by Conrail to be inconsistent with the present contentions of PC and MC that these debts represented only the excess of the face amount over what MC and PC owed CSR. Attached to CSR's memorandum was an affidavit of Canadian counsel for CSR responding to that of the Canadian counsel representing PC and MC with the contention that accrual of CSR's claims against them does not rest on a termination of the 1903 lease.

### Discussion

1. *Conrail's Motion for Judgment on the Pleadings.*

As the foregoing statement of the facts makes clear, the Final System Plan contemplated a transfer from PC and MC to Conrail of the creditor interests in CSR represented by the gold bonds and the instruments representing the advance. PC and MC argue that despite this it is inappropriate for us to order delivery of the bonds and the other instruments in view of their reserved right to a pass through of collections or distributions with respect to the creditor interests conveyed to them. We agree with this argument to the extent of conceding that we would have hesitated, had Conrail's demand for possession come before August 11, 1978, to order delivery of the bonds and other instruments without taking steps to assure that any collections and distributions, which under the terms of the 1976 assignments were reserved for the accounts of PC and MC, would in fact be remitted to them. We might, for example, have devised some sort of escrow arrangement permitting transfer of the obligations, some of which are in bearer form, but preserving Conrail's and the assignors' rights to assert an interest in any funds collected into the escrow account. This would not have interfered with Conrail's contemplated sale of the creditor interests to a third party.

However, any need for such an escrow arrangement resulting from the condition affixed to the designation of the bonds by the Supplemental Designations was removed by the settlement between the trustees of PCTC and Conrail, approved by PCTC's reorganization court on August 11, 1978, which required PC and MC to assign to Conrail "the right to receive for [their] own account[s] any collections or distributions in respect of the creditor interests." PC and MC argue that we are in no position to consider the 1978 assignments since our doing so would trench on the jurisdiction of the reorganization court. As we see it, however, the order of the reorganization court enters the picture only by eliminating the reason for a restriction we would have otherwise imposed on the outright delivery to Conrail of the gold bonds and the other instruments. On this view it seems competent for us to say that, in light of the subsequent developments in 1978, our Conveyance Order and the 1976 assignments entitle Conrail to unrestricted delivery of the gold bonds and the instruments representing the advance.

However, PC and MC confront us with a further point in opposition to the grant of Conrail's motion for judgment on the pleadings. This point, which is presented not in their answer but in paragraph 21 of their counterclaim, is that the 1978 assignments transferred to Conrail only "the right to receive collections or distributions in respect of the gold bonds and the Advance of only the net amount owing to Penn Central and MCR over and above any amount that might be owed by Penn Central and MCR to Canada Southern." The argument is that the gold bonds and the instruments representing the advance were held by PC and MC subject to an understanding that any amounts which the former were found to be owing to CSR could be set off against them and that any assignments to Conrail were subject to this same understanding. We find nothing in the papers to support this contention and much to contradict it. To be sure, so long as the gold bonds and the instruments representing the advance were held by PC and MC, they could, under ordinary principles of law, apply these against any amounts owing by them to CSR. However, retention of any such right would have been inconsistent with the provisions of the Final System Plan and the assignments by PC and MC to Conrail.

Nothing in the Plan or in the assignments affords any indication that the interest in the gold bonds and the instruments representing the advance could be diminished, let alone extinguished, as a result of claims by CSR against assignors. Thus, in describing the creditor interests to be conveyed to Conrail, the Notice of Supplemental Designations, *supra,* referred without qualification to "the matured bonds of the Canadian Southern Railroad ... and the advance to Canada Southern Railroad". The assignments themselves, although they carefully reserved for the accounts of the assignors any collections and distributions, were silent as regards any set off. Despite their assertion in their counterclaim, PC and MC have failed to demonstrate the existence of a substantial dispute concerning the identity of the interests conveyed in 1976 or the rights surrendered in 1978.

We therefore grant Conrail's motion for judgment on the pleadings on its claim against PC and MC.[3]

2. *Motions of Conrail, Canada Southern Railroad, United States and United States Railway Association to Dismiss the Counterclaim of Penn Central and Michigan Central.*

The movants begin their attack on the counterclaim with a procedural contention. They argue that while F.R.Civ.P. 13(h) allows persons other than those made parties to the original action to be made parties to a cross-claim or counterclaim in accordance with the provisions of Rules 19 and 20, this applies only when there is a proper counterclaim and that F.R.Civ.P. 13(a) and (b) permit as a counterclaim only claims against an opposing party. From that they proceed to argue that Conrail, the only opposing party in the original claim, was not named as a party to the counterclaim or, in the alternative, that if it should be

considered to have been named, there was no proper basis for making a claim against it.

■ We see no merit in the first contention. While the counterclaim did not specifically name Conrail as a counterclaim defendant, there was no need to do so since it was already a party to the action. We likewise reject the second contention. Although some of the grounds alleged for naming Conrail in the counterclaim are specious, *e.g.,* the fact that it is the controlling shareholder of CSR, it does not seem inappropriate that a counterclaim alleging that an assignment of the leasehold from PC and MC to Conrail was not a termination of the lease should name the assignee as a party. In any event, dismissal of the counterclaim on procedural grounds would be pointless since PC and MC would be free to institute in this court an independent action seeking the same relief.

The counterclaim ends with a request that this Court order and declare that the transfer by the Trustees of PCTC and the Trustee of MCR, as directed by this Court's Orders of March 25, 1976, did not cause a termination of the Canada Southern Lease, and that the lease remains in effect in accordance with its terms.

In its brief CSR argued that the request for such a declaration did not involve a viable case or controversy since CSR does not contend that the transfer has caused a termination in the ordinary meaning of that term, namely, an event that brought to an end the 1903 lease from CSR to MC and its assignees. At argument we pressed counsel for CSR as to why, if this is so, CSR has not formally stipulated to that effect. Counsel responded by expressing the willingness so to stipulate and we now take it that CSR has formally relinquished any claim that the transfer of March 31, 1976, operated to bring the leasehold to an end.

---

**3.** Technically, F.R.Civ.P. 12(c) permits a motion for judgment on the pleadings "[only] [a]fter the pleadings are closed". Although PC and MC argue that this precludes our granting Conrail's motion because answers have not yet been filed as regards the *counterclaim* brought by PC and

MC, we think its dismissal, see *infra,* cures any defect in the timing of Conrail's motion for judgment on its unrelated claim. *Edelman v. Locker,* 6 F.R.D. 272, 274 (E.D.Pa.1946) (dictum).

Since this issue has thus been obviated by stipulation, there is no need for our making a declaration to that effect—although we do add, for whatever help it may be, that it plainly was not the intention of the Final System Plan and the assignments thereunder that the leasehold should be so destroyed.

In their memorandum in opposition to the motion to dismiss the counterclaim, PC and MC enlarge upon the request in the counterclaim itself and ask us for the further declaration that nothing contained in our Conveyance Order or the assignments executed pursuant thereto should be interpreted as "accelerating any obligation for accounting or payments of obligations that would not have occurred in the absence of the Court's order and the assignments executed pursuant to that order." We could readily refuse to entertain this request on the simple basis that it was not made in the counterclaim and that the counterclaim cannot be amended merely by a memorandum of law. However, we think it better to deal with the request on the merits.

■ Whether the transfer accelerated any obligations for payment of amounts under the lease that would not otherwise have occurred requires the application to the facts of this case of Canadian law with respect to the time when a lessor can demand an accounting. While we would have no hesitation in saying that our Conveyance Order and the assignments executed pursuant to it should not be interpreted as having intended an end of the leasehold but only a transfer of the leasehold interest to Conrail, the question whether the latter accelerated any obligations for payment of any amounts under the lease requires interpretation of the lease in the light of Canadian law. The additional request does not seem to involve interpretation of the Conveyance Order or the assignments and thus appears to lie beyond our jurisdiction. Even if not, no useful purpose would be served by our engaging in an inquiry into the interpretation of the lease and the applicable Canadian law that would be necessary to decide the issue. While we would expect Canadian courts to pay heed to our declaration as to what was intended by the Conveyance Order and the assignments, there is no reason why they should defer to our views as to the effect thereof upon a lease, made with the approval of the Canadian Parliament, in an action pending in Canada. The decision whether to grant declaratory relief under 28 U.S.C. § 2201 rests in the sound discretion of the court. *Aetna Casualty & Surety Co. v. Quarles*, 92 F.2d 321, 325 (4 Cir.1937) (Parker, J.). We consider that it would not be a sound exercise of our discretion for us to entertain the additional request made in PC's memorandum. Accordingly, the counterclaim should be dismissed as to all the parties thereto.

Conrail's motion for judgment on the pleadings with respect to the complaint and the motions to dismiss the counterclaim are granted.