Evelyn INDYK and Leo Indyk,
Plaintiffs-Appellees-Appellants,

v.

HABIB BANK LIMITED,
Defendant-Appellant-Appellee.

Nos. 46, 252, Dockets 82–7045, 82–7073.

United States Court of Appeals,
Second Circuit.

Argued Sept. 1, 1982.
Decided Nov. 29, 1982.

---

Jeffry L. Feldman, New York City (Morton Zuckerman, Charles Meaden, Law Offices of Dunn & Zuckerman, New York City, on the brief), for defendant-appellant-appellee.

Gordon F. Harrington, Washington, Pa. (Paul D. Wexler, Dahan & Nowick, New York City, on the brief), for plaintiffs-appellees-appellants.

Before LUMBARD, CARDAMONE and WINTER, Circuit Judges.

CARDAMONE, Circuit Judge:

There are two issues involved in this appeal; both are governed by New York law. The first is whether a party to whom a bank's postdated cashier's check is delivered takes the check as a holder in due course; we hold that under New York law it may. The second is whether the bank which issued the cashier's check may properly assert a set-off to the amount it owes based upon a theory of unjust enrichment; we hold that under New York law applied to the facts in this case, it may not.

On February 4, 1980 plaintiffs Evelyn and Leo Indyk contracted to sell to Dome Investment Company (Dome) 100 percent of the shares of Monroe Contract Corporation (Monroe), a Pennsylvania coal mining firm, for one million dollars. The closing occurred on February 6, 1980 in the offices of Equibank in White Oak, Pennsylvania. Prior to that date Dome had made a down payment to the Indyks of $157,765. At the closing plaintiffs received, as payment on the balance of the purchase price, a cashier's check in the amount of $842,243.83 drawn on defendant Habib Bank Limited (Habib or Bank). The cashier's check was postdated June 4, 1980 and signed by Habib Assistant Vice President S. Hassan Ahmed. When plaintiffs presented the cashier's check on June 4, 1980 at Habib's New York City office, the Bank refused to pay claiming that the check was issued without either authority or consideration.

After Habib's dishonor of the check, plaintiffs entered into a second agreement

with the purchasers (Dome and its principals David James and Leslie Ray Smith) who agreed to pay the Indyks the unpaid balance of the purchase price plus interest. In exchange for this promise the Indyks permitted Dome to continue operating Monroe and agreed to transfer the Monroe stock to Dome upon completion of the monthly payments. Under this second agreement the Indyks had received payments from Dome which by September 1980 amounted to $171,067. At that point Dome defaulted and Monroe went bankrupt. The Indyks subsequently brought a diversity action in the United States District Court for the Southern District of New York against Habib on the dishonored cashier's check.

Following a bench trial before Judge Thomas P. Griesa, the court below held that Ahmed's signature on the check was authorized since he was an agent with apparent authority, and that the Indyks were "holders in due course" of the Habib check and took it free of Habib's asserted defense of lack of consideration. Judgment was entered in favor of the Indyks against Habib in the amount of $671,176 plus prejudgment interest and costs. The $671,176 represented the difference between the amount of the check, $842,243, and the installment payments of $171,067 received by the Indyks from Dome which the trial court credited to the Bank as an offset against the amount it owed.

Both parties appeal. Habib claims that the trial court erred in holding that the Indyks were holders in due course who took the postdated check free of Habib's defense of lack of consideration. The Indyks cross-appeal from that portion of the trial court's judgment which allowed Habib to offset the $171,067 received by the Indyks from Dome after Habib's dishonor of the check.

## I

We turn first to the issue involving the postdated cashier's check. The Uniform Commercial Code, N.Y.U.C.C. § 3–302(1) (McKinney 1964), provides that "[a] holder in due course is a holder who takes the instrument (a) for value; and (b) in good faith; and (c) without notice that it is overdue or has been dishonored or of any defense against or claim to it on the part of any person." The effect of achieving holder in due course status is of course that the holder takes the instrument free from certain defenses, including the defense asserted here—lack of consideration. See N.Y.U.C.C. § 3–305(2) (McKinney 1964).

Conceding that the Indyks took the cashier's check for value and in good faith, Habib asserts that the Indyks were not holders in due course because they took the postdated cashier's check with notice that defenses against the check existed. Specifically, Habib claims that the Indyks had notice because: they were aware that the cashier's check was postdated; their representative at Equibank, Mrs. Zell, expressed concern over the postdating and telephoned Mr. Ahmed at Habib to verify that the check was proper; banks normally do not use postdated cashier's checks; and the Indyks knew that Dome could not raise the necessary cash for the purchase of Dome's stock until June 4, 1980 and, therefore, at least impliedly knew that Dome did not give any consideration for the cashier's check. We find Habib's contention that the Indyks took the check with notice unpersuasive.

Under New York law notice of defenses means actual, subjective knowledge of defenses. See United States v. Novsam Realty Corp., 125 F.2d 456, 457 (2d Cir.1942); Chemical Bank v. Haskell, 51 N.Y.2d 85, 92–93, 432 N.Y.S.2d 478, 411 N.E.2d 1339 (1980). Notice is not shown merely by the existence of suspicious circumstances. Chemical Bank, 51 N.Y.2d at 93, 432 N.Y.S.2d 478, 411 N.E.2d 1339. There is no evidence in the record before us that the Indyks had actual, subjective knowledge that the Habib check was issued without consideration or subject to any defenses. The Indyks testified that they had never dealt with or even heard of Habib prior to the closing on February 6, 1980. The check, on its face, was conceded to be a regular Habib Bank cashier's check properly made out and signed by the Assistant

Vice President in charge of the bank department that issued cashier's checks. The postdating of the check did cause the Indyks' banker some concern, which prompted her to telephone Mr. Ahmed at the Habib bank. Mrs. Zell was advised that the check had been properly issued and authorized. She reported this information to the plaintiffs. Moreover, the postdating of the check alone was not legally sufficient to give the Indyks notice of a defense. *See* N.Y.U.C.C. § 3–304(4)(a) (McKinney 1964). While postdated cashier's checks are not normally used by banks, the Indyks did not know and had no reason to know of this specific banking practice. The fact that the Indyks might have been aware of Dome's lack of funds does not necessarily demonstrate that they subjectively knew that Dome had not given consideration to Habib for the cashier's check. Dome might well have paid for Habib's check with a note or some other non-cash consideration.

The district court's finding that the Indyks took without notice is a finding of fact that we will not disturb under Rule 52(a) of the Federal Rules of Civil Procedure unless "clearly erroneous." *See Oscar Gruss & Son v. First State Bank*, 582 F.2d 424, 430 (7th Cir.1978); *Bowling Green, Inc. v. State Street Bank and Trust Company*, 425 F.2d 81, 85 (1st Cir.1970). Absent any evidence that the Indyks had actual notice, the district court's conclusion that they were holders in due course entitled to judgment for the face amount of the check should be upheld.

## II

We turn now to the $171,067 offset granted Habib against its liability on the cashier's check. As noted, this sum was paid to the Indyks by the owners of Dome under the terms of the agreement of June 16, 1980, entered into after Habib's dishonor of the check. The offset was awarded Habib by the trial court upon its mistaken belief that a failure to grant it would unjustly enrich the Indyks.

Analysis and resolution of this issue must rest, as did the first issue, on New York law. The term "unjust enrichment" is founded upon the equitable principle that a person should not be allowed to enrich himself unjustly at the expense of another. Historically it arose in actions to recover on an implied or quasi-contract. 50 N.Y.Jur. *Restitution and Implied Contracts* § 3 at 150–51 (1966). It applies in situations where no legal contract exists, "but where the person sought to be charged is in possession of money or property which in good conscience and justice he should not retain, but should deliver to another." *Matarese v. Moore-McCormack Lines*, 158 F.2d 631, 634 (2d Cir.1946).

The granting of equitable relief lies within the sound discretion of the trial court, so long as that discretion is exercised in accordance with the applicable established precedents. To offset on a theory of unjust enrichment, there must first be enrichment. *See Milman v. Denniston*, 271 A.D. 988 (2d Dep't), *appeal dismissed*, 297 N.Y. 470, 74 N.E.2d 178 (1947). Equally crucial, as between the two parties to the transaction the enrichment must be unjust. *McGrath v. Hilding*, 41 N.Y.2d 625, 629, 394 N.Y.S.2d 603, 363 N.E.2d 328 (1977); Restatement of Restitution § 1 comments a and c (1937). Here neither criterion was met.

While the genesis of the second agreement which Dome entered into remains shrouded,[1] the fact remains that Dome defaulted; Monroe went bankrupt and all the machinery owned by the Indyks was repossessed. As Mr. Indyk testified,

---

1. There is testimony that Mr. Indyk was called by Mr. James, one of Dome's principals, on the evening of June 3rd—one day before the cashier's check was due to be paid. James suggested, according to the testimony of a Federal Bureau of Investigation agent subpoenaed to testify, that the Indyks should postpone for two weeks the presentment of the check to the Habib Bank. In return, according to the FBI agent, James promised to pay Indyk $20,000. Mr. Indyk rejected this suggestion. From this and other evidence in the record a strong inference emerges that Dome had reasons for entering into the June 16th agreement other than an honest desire to guarantee that its original promise, made on February 4, 1980, be kept.

"there is nothing left." The Indyks have been saddled with personal exposure for about one million dollars owing on backfill performance bonds. These bonds—necessary to a strip coal mining operation—were to have been transferred into the names of Dome and Monroe after the sale. Needless to say, the transfer never took place. So much for enrichment.

Even assuming enrichment, the Indyks were not "unjustly" enriched. The issue is whether the Indyks are in possession of $171,067 which rightly belongs to the Bank. We find it difficult to see why the Indyks should in good conscience deliver this money to Habib. Several reasons persuade us. To begin with the sum did not come to the Indyks from Habib. It was paid by Dome under the terms of the June 16 agreement. Further, that agreement only came into existence as a result of Habib's wrongful refusal to honor its own cashier's check. This act by the Bank left the Indyks with more than 80 per cent of the purchase price unpaid. The Bank contractually engaged that it would pay the full amount of the instrument on June 4, see N.Y.U.C.C. § 3–413(1) (McKinney 1964), while Dome and Monroe, on the other hand, were under no obligation to the Indyks to make further payment after June 4, the date when the cashier's check was due. Dome's obligation under the original contract to pay the balance of the purchase price was discharged *pro tanto* when the Indyks accepted the Habib check. *See* N.Y.U.C.C. § 3–802(1)(a) (McKinney 1964). To invoke equity requires the indispensable ingredient that between the two parties involved there must be an injustice. If there be any injustice here, it has been inflicted upon the Indyks by Habib rather than the other way around. Thus, the set-off claim fails.

Having disposed of the equitable argument advanced to obtain an offset, we further observe that by issuing the cashier's check the Bank established a direct debtor-creditor relationship with the Indyks, *Myers v. First National Bank of Scotia,* 42 A.D.2d 657, 658, 345 N.Y.S.2d 204 (3d Dep't 1973), *Manhattan Imported Cars, Inc. v. Dime Savings Bank of New York,* 70 Misc.2d 889, 890, 335 N.Y.S.2d 356 (App.Term, 1st Dep't 1972), and, as noted, unconditionally contracted to pay the instrument according to its original tenor, *see* N.Y.U.C.C. § 3–413(1). Since the cashier's check represented Habib's own direct and unconditional promise to pay, *see International Firearms Co. v. Kingston Trust Co.,* 6 N.Y.2d 406, 411, 189 N.Y.S.2d 911, 160 N.E.2d 656 (1959), Habib cannot resist such payment by claiming a setoff potentially available to Dome, if the Indyks were to sue Dome on the contract of sale, *Manhattan Imported Cars,* 70 Misc.2d at 890, 335 N.Y.S.2d 356. For the same reason Habib may not assert an offset that also might be available to Dome in a putative action by the Indyks based on the second agreement. To permit a bank to assert such offsets would undermine the usage and wide acceptance of cashier's checks which circulate in commerce as the equivalent of cash. *See International Firearms Co.,* 6 N.Y.2d at 411, 189 N.Y.S.2d 911, 160 N.E.2d 656.

It was error therefore for the trial court to offset in Habib's favor the $171,067 paid to the Indyks by Dome. The Habib Bank must pay the full amount of its cashier's check, or $842,243.83. The judgment of the district court is modified accordingly.