### The PENN CENTRAL CORPORATION, Plaintiff,

v.

### The CHICAGO UNION STATION COMPANY and The National Railroad Passenger Corporation, d/b/a Amtrak, Defendants.

General Panel Civ. A. No. 89–02.

Special Court, Regional Rail Reorganization Act of 1973.

July 23, 1993.

Paul R. Duke, David L. Meyer, Laura A. Fingerhut, Teresa M. Gillis, Covington & Burling, Washington, DC, for plaintiff Penn Central Corp.

Anthony C. Epstein, John H. Broadley, Jerome L. Epstein, Douglas H. Hsiao, Jenner & Block, Washington, DC, for defendants Chicago Union Station Co. et al.

. Before WISDOM, Presiding Judge, and GASCH, and GREEN, Judges.

WISDOM, Presiding Judge:

The Penn Central Corporation ("Penn Central") brings this suit against the National Railroad Passenger Corporation d/b/a Amtrak ("Amtrak") and its wholly owned subsidiary, the Chicago Union Station Company ("CUSCO"), to recover monetary advances it made to CUSCO before passage of the Regional Rail Reorganization Act of 1973 ("Rail Act") and adoption of the Final System Plan ("FSP"). Penn Central advanced approximately 17.5 million dollars to CUSCO over a period of sixty-three years ending in 1976. In accordance with the FSP and the resulting conveyance documents, Penn Central transferred its creditor interests in CUSCO to Amtrak in 1976. This conveyance did not, however, transfer all of Penn Central's rights in the funds it advanced to CUSCO; it reserved Penn Central's right to receive any funds ever distributed by CUSCO to Amtrak on account of Penn Central's advances.

After significant changes in CUSCO's profitability and ownership occurred, Penn Central demanded repayment from both CUSCO and Amtrak. CUSCO and Amtrak refused. The Special Court heard oral argument and reviewed the parties' submissions of fact and argument. We hold that principles of equity require CUSCO to repay Penn Central's advances.

## I.

In 1913, four railroads (the predecessors of Penn Central, Milwaukee Road ("MR"), and Burlington Northern ("BN"))[1] jointly incorporated CUSCO to build and maintain a railroad station in Chicago for their joint use. Each railroad contributed real property and capital in exchange for stock, with the result that BN and MR's predecessors each owned 25% of CUSCO's stock and Penn Central's predecessors owned 50%. These railroads are referred to as the "proprietors" of CUSCO.

From the incorporation of CUSCO in 1913 until the adoption of the FSP in 1976, the proprietors financed CUSCO's construction and additional capital expenditures by issuing a series of CUSCO bonds and guaranteed notes. In 1915, CUSCO issued $60 million in First Mortgage Gold Bonds to mature on July 1, 1963. The proprietors agreed to guarantee the bonds, to cover the interest on the bonds through rental payments, and to advance any funds needed to repay the principal due on the bonds in proportion to each proprietor's ownership share.[2] CUSCO agreed to reimburse the proprietors for their advances after its bonded debt was retired and it was financially capable of repayment.[3] In addition, the proprietors agreed to pay rent to cover CUSCO's operating expenses in proportion to their use of the station.[4]

In 1916, during the construction of the CUSCO facility, the proprietors agreed to advance additional funds to cover the interest obligations on the 1915 bonds rather than providing for these interest payments through rentals.[5] In 1924, CUSCO issued another $15 million in Guaranteed Gold Bonds to mature on December 1, 1944. Incident to this issuance, the proprietors again agreed to act as guarantors of the new debt and to subordinate their claims to the rights of the new bondholders.[6] In accordance with the new agreement, the proprietors returned to their original agreement to cover CUSCO's interest obligations by paying rents.[7] Further, in 1925 when the CUSCO facility was completed, the proprietors agreed that interest would no longer accrue on their advances for bond interest.[8] The debts would, however, remain on CUSCO's books for future repayment.

From 1935 through 1944, CUSCO refinanced its debt on six different occasions by issuing new bonds and guaranteed notes. On each occasion the parties adhered to the same basic format: CUSCO issued a series of bonds, guaranteed notes, or both; the proceeds were used to retire a portion of CUSCO's outstanding bonded debt; and the proprietors, by supplemental agreement, guaranteed the new bonds and notes agreeing to subordinate their claims on their advances to CUSCO's outside debt.[9] Reiterat-

---

1. The four railroads included the Chicago, Burlington, & Quincy Railroad Co. (a predecessor of BN), the Chicago, Milwaukee and St. Paul Railway Company (a predecessor of MR), the Pennsylvania Company, and the Pittsburgh, Cincinnati, Chicago & St. Louis Railway Company (two predecessors of Penn Central).

2. *See* July 2, 1915 Operating Agreement, Penn Central's Opening Submission of Fact and Argument, Ex. 6.

3. *See* Penn Central's Opening Submission of Fact and Argument, Ex. 3.

4. *See* Penn Central's Opening Submission of Fact and Argument, Ex. 6.

5. *See* Penn Central's Opening Submission of Fact and Argument, Ex. 7. The agreement provided that any advances made on account of CUSCO's interest obligations would earn interest at 4.64% per annum until construction of the facility was completed. Currently, $6,240,998 remains on

CUSCO's books as advances owed to Penn Central for "Bond Interest".

6. *See* Penn Central's Opening Submission of Fact and Argument, Exs. 12 and 13.

7. *Id.*

8. *See* Penn Central's Opening Submission of Fact and Argument, Ex. 14.

9. In 1935, CUSCO issued $16 million in First Mortgage Bonds to mature on July 1, 1963 and $2,100,000 in guaranteed notes maturing April 1, 1944. *See* Penn Central's Opening Submission of Fact and Argument, Ex. 19–20. CUSCO used the proceeds from this issuance to retire a series of the original 1915 bonds. In 1936, CUSCO issued $44 million dollars of First Mortgage Bonds and $600,000 in guaranteed notes. Ex. 21–22. Similarly, these proceeds also went to retire some of the 1915 bonds. Later that same year, CUSCO issued $7 million in Guaranteed

ing the terms of the 1915 agreement, the proprietors agreed to cover the interest payments on these new bonds and notes by paying "rent" to CUSCO and to advance any funds necessary to cover the principal on these bonds when they matured.[10] Additionally, they agreed on two separate occasions to advance funds to a sinking fund used to redeem additional outstanding bonds.[11]

Between 1944 and 1963, CUSCO negotiated additional loans and lines of credit to provide funds needed to meet its outstanding bond obligations. The proprietors agreed to pay rent to cover the interest on these loans, and agreed to advance additional funds to cover the principal. In each of these transactions, the proprietors agreed to subordinate and postpone repayment of their advances until after CUSCO had repaid all of the principal and interest on these loans.[12]

In 1963, the proprietors' 1915 operating agreement expired. The proprietors then entered a renewed agreement extending the terms of the 1915 agreement for an additional 50 years. In addition, they refinanced CUSCO's outstanding debt ($49 million) for the last time. CUSCO issued $29 million in First Mortgage Sinking Fund Bonds and $20 million in Serial Debentures, another form of bond. The debentures were to mature at the rate of $2 million per year between 1964 and 1973. The proprietors agreed to retire the First Mortgage bonds at a rate of $1 million per year beginning in 1974, with a final balloon payment of $15 million due in 1988.[13] The agreement provided that the proprietors would advance the funds necessary to carry out this agreement.[14] Under the terms of the agreement, the proprietors once again guaranteed CUSCO's indebtedness and subordinated their claims for their advances to those of the holders of the newly issued bonds.

Penn Central advanced a total of $5,368,020 under the 1963 agreement. In addition, when Penn Central entered bankruptcy in 1970, BN and MR stepped in and paid Penn Central's share of these advances ($1,471,486) for the years of 1971, 1972, and 1973. Eventually, in 1983, Penn Central repaid BN and MR in exchange for the right to be repaid for the advances subject to the same restrictions placed on Penn Central's right to be repaid on its other advances.[15] A total of $6,839,506 is currently outstanding on CUSCO's books as owed to Penn Central on account of advances made under the 1963 agreement.

In addition to these advances, the proprietors made occasional advances for "additions and betterments" over the life of CUS-

Bonds due September 1, 1951. Ex. 23–24. The proceeds were used to redeem some of the 1924 bonds. In 1940, CUSCO issued $16 million in First Mortgage Bonds and $600,000 in Guaranteed Notes. Ex. 25. In 1941 CUSCO issued $6,860,000 in Guaranteed Serial Bonds to mature between 1942 and 1951. Ex. 26. Finally, in 1944, CUSCO issued $37,800,000 in First Mortgage Bonds and $6,200,000 in Guaranteed Serial Notes due between 1945 and 1954. Ex. 27. The proceeds were used to redeem $44 million of old bonded debt.

10. *Id.* $300,000 remains due to Penn Central for advances made under the 1940 agreement. $335,000 remains due to Penn Central for its advances made under the 1941 agreement. $1,722,616 remains on CUSCO's books due to Penn Central on account of advances made under the 1944 agreement. *See* Penn Central's Opening Submission of Fact and Argument, Exs. 10 and 11.

11. *See* Supplemental Agreement of 1935 and the September 1936 Agreement. Penn Central's

Opening Submission of Fact and Argument, Exs. 20 and 24. $58,084 remains on CUSCO's books as owed to Penn Central on account of advances to these sinking funds.

12. In 1955, CUSCO established a line of credit for $2,700,000 from Harris Trust & Savings Bank. In 1957, CUSCO borrowed $2.5 million from Continental Illinois Bank & Trust of Chicago. In 1959, 1961, and 1962, CUSCO borrowed another $2.5 million each year. $50,000 remains due to Penn Central for advances made to repay these loans. *See* Penn Central's Opening Submission of Fact and Argument, Exs. 28–30.

13. *See* Penn Central's Opening Submission of Fact and Argument, Exs. 33 and 34.

14. *See* Penn Central's Opening Submission of Fact and Argument, Ex. 35.

15. *See* Mutual Release, Penn Central's Opening Submission of Fact and Argument, Ex. 36.

CO.[16] CUSCO currently owes a total of $17,504,377[17] on account of Penn Central's advances.[18] The parties do not dispute this sum.

In 1971, Amtrak succeeded the proprietors' inter-city passenger operations by Act of Congress. BN and MR continued to operate Chicago's commuter rail services. Although Amtrak used CUSCO's facility and paid a share of its operating costs, it did not formally become a proprietor at this time. In 1976, Penn Central conveyed all of its interests in CUSCO to Amtrak[19] in accordance with the FSP.[20] Penn Central transferred all of its stock in CUSCO (50% of all outstanding CUSCO shares) and additionally transferred its creditor interests as well. The conveyance documents state in pertinent part:

> [Penn Central transfers] all outstanding stock owned by [Penn Central] in [CUSCO] and also any interest of [Penn Central] as creditor of [CUSCO].... Any collections by or distributions to [Amtrak] with respect to such creditor interests shall be for the account of [Penn Central]. However, [Amtrak] assumes no obligation to collect or require repayment of any indebtedness owing by [CUSCO] to [Penn Central] or to enforce any contract or agreement relating to such indebtedness.[21]

Despite its new status as a 50% owner of CUSCO's stock, Amtrak did not assume the status of a proprietor of CUSCO (Amtrak did not become a party to either the 1915 or 1963 proprietors' agreement) rather it continued to use CUSCO's facility as a tenant.

At the time of the conveyance, CUSCO was not a profitable corporation. In order to protect CUSCO's ability to provide rail services, Penn Central's control over the timing of CUSCO's repayment of Penn Central's advances had to be extinguished. The conveyance of Penn Central's creditor interests accomplished this goal. The conveyance of the creditor interests avoided the possibility of Penn Central's immediately demanding repayment, which would have threatened CUSCO's ability to provide rail services in 1976.

Since the conveyance, CUSCO has made a dramatic financial turn around. In the early 1980s, CUSCO's real estate holdings began to generate large profits.[22] Additionally, CUSCO began operating its rail services at a marginal profit. Consequently, the real estate revenues were used entirely to retire CUSCO's bonded debt. In 1988, that debt was repaid in full with cash generated from CUSCO's real estate holdings. Currently, CUSCO's real estate holdings continue to

16. $1,983,172 remains on CUSCO's books as owing to Penn Central on account of these advances.

17. When the advances, as described by Penn Central in its Opening Submission of Fact and Argument and not disputed by Amtrak or CUSCO, are added up, they total $17,529,376 not $17,504,377. Thus, According to Penn Central's calculations, it is entitled to $24,999 less than its numbers would indicate. For purposes of this judgment, we adopt the total offered by Penn Central.

18. CUSCO has classified these advances as long-term debt and placed them in "Account 769".

19. Technically, Penn Central transferred its interests in CUSCO to the Consolidated Rail Corporation ("Conrail"), which then immediately transferred the same interests directly to Amtrak.

20. Penn Central received a lump sum in exchange for all of its properties transferred under the FSP. Since Penn Central was not paid for each asset or parcel of property on an individual basis, it is impossible to determine the exact

amount of the compensation attributable to the transfer of Penn Central's CUSCO interests.

21. Exhibit A, Bill of Sale and Assignment between Trustees of the Property of the Penn Central Transportation Company and Conrail, dated July 1, 1976 ("conveyance documents"), Penn Central's Opening Submission of Fact and Argument, Ex. 122.

22. CUSCO first sold a parcel of its real estate to the United States Post Office in the 1930s. Penn Central's Opening Submission of Fact and Argument, Ex. 41. In 1941 CUSCO sold some air rights to the Chicago Daily News. Ex. 42. In the late 1960s, CUSCO reentered the real estate market by leasing air rights to a local developer. Three office buildings were constructed on these sites. In 1980, more air rights were leased and a fourth office building was constructed over CUSCO property. Ex. 44. In 1982, CUSCO sold a second parcel to the United States Post Office. By 1988, CUSCO's real estate revenues had grown to approximately $4 million a year. Ex. 55. All of these proceeds were used to retire CUSCO's bonded debt.

generate millions of dollars each year.[23]

Significant additional changes have also occurred. As CUSCO's real estate business soared, BN and MR continued to experience financial difficulties. MR entered bankruptcy reorganization in 1977 and in 1982, Chicago's Regional Transportation Authority ("Metra") took over MR's commuter service operations. Thus, MR assumed the limited status as stockholder in and creditor of CUSCO. As a result, MR began to exert pressure on CUSCO to distribute funds to repay its advances. Although a distribution could have been funded by the profits generated by CUSCO's real estate holdings, Amtrak was reluctant to depreciate the value of these holdings or to decrease their potential for future revenues. Moreover, a distribution to BN and MR on their advances would have triggered Penn Central's right to a proportionate share of the distribution on advances. In 1984, Amtrak entered an agreement with BN and MR to purchase their stock and creditor interests in CUSCO. BN and MR received $15 million in exchange for relinquishing all of their interests in CUSCO to Amtrak.[24] Although Amtrak in practical effect paid BN and MR the amount owed on their advances, the transaction was put in the form of a purchase of stock and creditor interests—not a repayment of advances. This was a means of avoiding repayment to Penn Central. In 1984, therefore, Amtrak became the sole shareholder of CUSCO and the owner of the right to be repaid for advances made by BN and MR to CUSCO.

In 1988, the final balloon payment of $15 million on the bonded debt issued by CUSCO came due. CUSCO paid this entirely out of cash-at-hand, which was generated by its real estate holdings. This payment extinguished the last of CUSCO's outside debt. All that remained in 1988 was CUSCO's obligation to repay the advances made by its original proprietors—42% of which is owed to Penn Central, 58% to Amtrak (which purchased the right to repayment on these advances from BN and MR).

Free from its previously burdensome debt, CUSCO embarked on a massive program of capital expenditures beginning in 1989. CUSCO planned three separate projects one of which has been completed, another that is underway, and a third that has not yet been started. Metra, the only other user of the CUSCO facility aside from Amtrak, has contributed and agreed to contribute in the future its operational share of these capital expenditures; Amtrak has contributed significantly less than its operational share. First, CUSCO spent approximately $32 million on the Passenger Facilities Improvement project.[25] This project involved the reconstruction and renovation of CUSCO's passenger facilities. Consistent with CUSCO's history, Metra contributed its proportionate operating share, $7 million.[26] Amtrak originally contributed nothing; however, after Penn Central filed this suit, Amtrak agreed to raise its rental payments to CUSCO by $1 million per year for three years to help cover

---

**23.** Since 1988, CUSCO has continued rapidly to expand its real estate development. In 1988, CUSCO sold a parcel for $6.8 million. Penn Central's Opening Submission of Fact and Argument, Ex. 57. Further CUSCO entered a 99-year lease of more air rights and extended its earlier lease for an additional 110 years. CUSCO generates $1.3 million a year from its new lease and received $2 million in cash plus the right to receive $1.9 million a year from its lease extension. The extended lease brings in a variable rate of revenue that is estimated to exceed $5.3 million a year by 2000 and $8.7 million a year by 2010. *See* Weissheimer Deposition, p. 341 and Ex. 58. In addition, CUSCO agreed to allow the development of offices over its headhouse in consideration of 50–55% of revenues generated by the offices upon construction. This project is scheduled to begin in 1998. CUSCO will receive approximately $4 million a year upon completion if the plan is carried out. A

second project is also in the works. If successful, it will generate $3.3 million a year. Further, CUSCO also owns six undeveloped parcels of land.

**24.** Amtrak left the allocation of the purchase price to BN and MR. BN and MR ultimately divided the funds according to the amount each had advanced to CUSCO. BN and MR were each 25% stockholders at the time of the sale. Yet, they divided the proceeds from the sale 55/45, in proportion to their outstanding advances to CUSCO.

**25.** *See* Penn Central's Opening Submission of Fact and Argument, p. 144; Defendants' Response, p. 89.

**26.** *Id.* at 145, Defendants' Response at 89.

the costs of this project.[27] CUSCO bore the remaining cost of $21 million.

Next, CUSCO began reconstructing its trackage and switches on the western side of the station in the Harrison Street Interlocking project.[28] CUSCO estimated that the project would cost $55 million to complete. Metra agreed to contribute approximately $37 million.[29] To date, Metra has contributed $16 million to the project.[30] Amtrak has contributed only $1.7 million.[31] CUSCO will bear the remaining cost of $16.3 million. CUSCO plans to spend $27 million on the Lake Street Interlocking project to replace the track interlockings on the northern side of the station. This project has not begun. Metra has agreed to contribute $25 million, its proportionate operating share.[32] CUSCO plans to contribute the remaining $2.5 million. Amtrak will contribute nothing under the current plan.

Aware of these events, Penn Central approached CUSCO and Amtrak to negotiate a repayment schedule. CUSCO and Amtrak refused Penn Central's request. Penn Central then filed suit to recover on its advances to CUSCO. Penn Central originally filed in federal district court in the Northern District of Illinois. The case was dismissed for lack of subject matter jurisdiction and refiled in this court in September 1989. Amtrak filed a motion to dismiss for failure to state a claim. This court denied Amtrak's motion in April 1990.[33]

Penn Central raises several alternate theories to support its contention that CUSCO and Amtrak are currently obligated to repay its advances. Although we reject many of these theories, we find in favor of Penn Central and order the parties to act in accordance with this opinion.

## II.

*The Legal Effect of the 1976 Conveyance:*

Penn Central argues that the conveyance did not extinguish its right to demand payment once CUSCO became able to pay without threatening its rail services. Instead of focusing on the terms of the conveyance, Penn Central looks to the purpose behind the conveyance in the light of the overall goals of the FSP. Although we agree with Penn Central's characterization of the purpose behind the conveyance, we find that the plain language of the conveyance extinguished Penn Central's legal [34] right to demand repayment of its advances.

In accordance with the FSP, Penn Central transferred its interests in CUSCO to Amtrak in 1976. Under the conveyance, Penn Central transferred "[a]ll outstanding capital stock [in CUSCO]" and "any interest [in CUSCO] as creditor".[35] Yet, the conveyance reserved Penn Central's right to receive the proceeds of "[a]ny collections by [CUSCO] or distributions to [Amtrak] with respect to such creditor interests".[36] Instead of addressing this language, Penn Central attempts to shift the court's focus to the purpose behind the conveyance.

 According to Penn Central, the purpose and intent of the FSP was to transfer only rail properties from Penn Central to either Conrail or Amtrak. This in mind,

---

**27.** *See* Hayward Declaration, p. 4; Penn Central's Rebuttal, p. 90.

**28.** The record does not reflect whether this project was ever completed. The parties' discussion at oral argument implies that it has at least begun.

**29.** Ellis Deposition at 61–62; Penn Central's Opening Submission of Fact and Argument, Vol. 2(b).

**30.** Transcript of Oral Argument, June 14, 1993, p. 28.

**31.** *See* Hayward Deposition, p. 4; Penn Central's Rebuttal, p. 90.

**32.** *See* Hayward Declaration, p. 5. Hayward along with counsel for the defendants has expressed doubts as to whether Metra will have the funds to actually contribute this amount.

**33.** April 23, 1990, Order (Sp.Ct.R.R.R.A.).

**34.** We use the term "legal" as opposed to "equitable" for purposes of this section.

**35.** Penn Central's Opening Submission of Fact and Argument, Ex. 122.

**36.** *Id.*

Penn Central argues that the sole purpose behind the conveyance of its creditor interests in CUSCO was to prevent Penn Central from demanding immediate repayment of its advances in 1976, which would have jeopardized CUSCO's rail activities because of CUSCO's inability to pay the advances at that time. We agree. As this court has already stated, the "purpose behind the conveyance was to protect the usefulness of the transferred properties by preventing the immediate repayment of long-term debt that otherwise would not have been repaid".[37] According to Penn Central, its interest in the advances remained intact. This does not follow.

The conveyance transferred all of Penn Central's stock in CUSCO along with "any interest of [Penn Central] as creditor of [CUSCO]".[38] Although it reserved the right of Penn Central to receive "any collections by or distributions to [Amtrak] with respect to such creditor interests",[39] it is clear that the transfer of the "creditor interests" removed any control that Penn Central had as a proprietor to effect such a collection or distribution.

In spite of this plain language, Penn Central argues that the only right that was transferred was its right to demand *immediate* repayment. This assertion overlooks the plain language of the conveyance documents. Although the drafters may have been motivated by the desire to prevent only an immediate repayment that would jeopardize CUSCO, this is not what the conveyance documents state.

In drafting the FSP and the conveyance documents, the United States Railway Association ("USRA") was in fact concerned about the actions of transferor railroads that could have had an adverse impact on the ability of the transferee railroads to operate successfully and manage their newly acquired rail properties. The FSP provides,

Recently, several [entities owning rail properties] have been caused, by various trustees of bankrupt estates to take actions which are outside of the ordinary course of business and which tend to destroy, encumber or diminish the control of, or rights with respect to, the underlying rail properties sought to be conferred on [the transferee railroads] through the designation of stock interests.... Similarly, the declaration of extraordinary dividends, *the payment of inter-company claims which are in dispute or which have long been withheld from payment,* and efforts to dispose of substantial assets of subsidiaries are examples of the kinds of actions which are inconsistent with the intent and requirements of the Rail Act and the purpose of the designations of stock interests in the Final System Plan.[40]

To alleviate this problem, USRA caused certain other properties to be transferred along with the necessary rail properties. In the instant case, USRA required Penn Central to transfer its creditor interests in CUSCO to protect Amtrak's new interest in CUSCO's rail properties transferred through Penn Central's transfer of CUSCO stock to Amtrak.

It is clear that the language of the 1976 conveyance accomplished this task. The abolition of Penn Central's status as creditor of CUSCO was consistent with the purpose of the FSP: it ensured that Penn Central could not assert a creditor interest at a time when CUSCO was in a tenuous financial position, which would have threatened Amtrak's ability to "control the underlying rail properties sought to be conferred through the designation of stock interests".[41] It does not necessarily follow, however, that Penn Central's right to assert its creditor interests was limited only to the period immediately following the conveyance. Indeed, the conveyance places no such limitation on the transfer of Penn Central's creditor interests. Rather, the conveyance documents

37. April 23, 1990, Order, at p. 2 (Sp.Ct.R.R.R.A.).

38. Penn Central's Opening Submission of Fact and Argument, Ex. 122.

39. *Id.*

40. 41 Fed.Reg. 8846–47 (March 1, 1976), Defendants' Response, Ex. 20, at para. 4. (emphasis added).

41. *Id.*

state in absolute terms that Penn Central conveys "any interest" in CUSCO which it has "as creditor". If USRA had intended to limit Penn Central's ability to assert a creditor interest for a short time only, presumably it would have drafted the conveyance documents to reflect this intention. Where the purpose behind the conveyance is consistent with the conveyance language itself, this court is bound to construe the language based on its plain meaning.[42] The plain meaning of the conveyance is that Penn Central has a legal right to repayment of its advances only when and if CUSCO causes a distribution on account of the advances.[43]

■ Next, Penn Central argues that its advances are payable on demand—its demand—based on the general principles of contract law. According to Penn Central, debts without a fixed date of maturity are payable on demand.[44] This simple rule does not, however, support Penn Central's contention that it has the right to demand payment. In fact, this argument begs the question of whether Penn Central transferred *its* right to demand payment when it transferred its creditor interests to Amtrak. The debt may be payable on demand, but Penn Central's argument does not address the real issue of whether Penn Central retained the right to make such a demand. At best, this argument supports the proposition that the holder of the creditor interest is now entitled to make a demand. Amtrak, not Penn Central, is the holder of the creditor interest.

In the alternative, Penn Central contends that Amtrak is legally obligated to repay Penn Central for the advances Penn Central made to CUSCO. Penn Central offers two arguments to support its contention. First, it argues that the conveyance imposed a duty not to interfere with a distribution from CUSCO on account of the advances on Amtrak. Penn Central maintains that Amtrak breached this "duty". Second, Penn Central argues that CUSCO, in effect, distributed funds to Amtrak on account of the advances by covering Amtrak's operating share of CUSCO's capital expenditures. We reject both of these arguments.

■ The conveyance documents expressly provide: "[Amtrak] assumes no obligation to collect or require repayment of any indebtedness owing by [CUSCO] to [Penn Central] or to enforce any contract or agreement relating to any such indebtedness".[45] In spite of this language, Penn Central argues that by reserving Penn Central's right to receive any funds distributed by CUSCO on account of the Penn Central advances the conveyance imposed an obligation on Amtrak not to interfere with CUSCO's repayment of Penn Central's advances. We reject this contention. The language of the conveyance clearly imposed no duty on Amtrak with regard to the collection or distribution on account of the advances.

■ In a more cogent argument, Penn Central maintains that a de facto distribution has occurred, entitling it to repayment from Amtrak. This contention too, however, ultimately fails to persuade. The conveyance documents state: "[a]ny collections by or distributions to [Amtrak] with respect to [the advances] shall be for the account of [Penn Central]".[46] It is undisputed that if CUSCO distributes funds on account of the advances, the pro rata share representing payment on the advances made by Penn Central would belong to Penn Central. Further, the parties are in agreement that Penn Central is entitled to its share of *any* distribution made by CUSCO to its shareholder (Amtrak).[47]

---

**42.** *Consolidated Rail Corp. v. Penn Central Corp.,* 543 F.Supp. 457, 460–61 (Sp.Ct.R.R.R.A.1982).

**43.** It is worth noting that Penn Central itself took this position before the District Court of the Eastern District of Pennsylvania. Defendants' Response, Ex. 23, at 18.

**44.** Penn Central offers scant authority to support this position. *See* Penn Central's Opening Submission of Fact and Argument at 50 (citing L.

Simpson, *Handbook of the Law of Contracts* § 46, at 72 (1965) and a few 19th Century cases as its only authority).

**45.** Penn Central's Opening Submission of Fact and Argument, Ex. 122.

**46.** *Id.*

**47.** *See* Penn Central's Opening Submission of Fact and Argument, Ex. 133, at 3.

The real dispute concerns whether or not CUSCO has made a de facto distribution to Amtrak by using its funds to cover Amtrak's "rightful" operating share of CUSCO's capital expenditures. According to Penn Central, the cost of refurbishing the station should be borne by the users, or "operators", of CUSCO, not CUSCO itself.[48] There are only two operators of CUSCO, Amtrak and Metra. Unlike Amtrak, Metra has contributed its proportionate operating share of the capital expenditures made to refurbish CUSCO. Thus, argues Penn Central, CUSCO has been distributing funds to Amtrak by paying the costs that Amtrak arguably should have borne.

Were Amtrak a private railroad, Penn Central might prevail based on this theory. Amtrak, however, is far from being a private railroad. As Amtrak points out, by its very nature, it is arguably not required to contribute towards CUSCO's capital expenditures.[49] Section 402(a) of the Rail Passenger Service Act requires Amtrak to contribute only "incremental costs"[50] to the railroads whose tracks and services it uses. Moreover, such a finding would require this court to adopt an intrusive role in CUSCO's financial management. Without evaluating the nature of CUSCO's capital expenditures, we decline to find that a de facto distribution occurred.

In its final legal argument, Penn Central contends that CUSCO has a continuing legal obligation to Penn Central to distribute funds on account of its advances. Penn Central maintains that the 1976 conveyance did not affect CUSCO's obligation to Penn Central to repay its advances.

■ Penn Central correctly recounts the terms of the 1915 and 1963 Proprietors' Agreements stating that CUSCO agreed to repay its proprietors' advances once all guaranteed debt was retired and CUSCO became financially able to repay. Next, it points out that these contingencies have been met; CUSCO retired its last bonds in 1988 and is currently generating millions of dollars in real estate revenue. Finally, Penn Central turns again to general contract principles to argue that where the time for performance is not specified, the latest date the law allows for repayment on obligations in general is after a reasonable time has elapsed.

From these premises, Penn Central asks this court to conclude that CUSCO has a continuing duty *to Penn Central* to repay the advances within a reasonable time once the contingencies have been met. Penn Central argues that an assignment of a contract merely converts the obligor's duty to the assignor into a duty owed the assignee (Amtrak in this case). By this very argument, Penn Central effectively admits that any contractual duty of CUSCO to pay is owed not to Penn Central but to *Amtrak* as assignee of Penn Central's creditor interests. Amtrak not only has not asked to be repaid, it does not want to be repaid; further, it has no obligation to demand repayment.[51] Although the conveyance did not alter CUSCO's contractual obligation to repay the advances, it did alter *to whom* that duty was owed. Penn Central has no legal authority to enforce a duty owed to Amtrak.

In summary, we reject Penn Central's arguments that it has the legal right to assert a creditor interest in CUSCO and to control the timing of repayment of its advances. The conveyance explicitly extinguished these rights. Our inquiry does not, however, end at this juncture. Penn Central raises two arguments involving the application of the principles of equity to the instant case.

**48.** Historically, because CUSCO was not a profitable entity, it had no funds with which to pay for its own capital expenditures. Instead, the operators (most if not all of whom were also its proprietors) would contribute funds or advance funds to cover CUSCO's needs.

**49.** *See* 45 U.S.C. § 562(a).

**50.** Incremental costs are the same as avoidable costs—the costs that would not be present if Amtrak's usage were eliminated. *National Railroad Passenger Corporation Application under Section 402(a) of the Rail Passenger Services Act*, F.D. 30426, at 6–7 (ICC July 5, 1985) (1985 ICC Lexis 318) (*Metro–North*), affirmed, *MTA v. I.C.C.*, 792 F.2d 287 (2d Cir.1986).

**51.** Penn Central's Opening Submission of Fact and Argument, Ex. 122.

*Equity's Role in the Light of the Changed Circumstances:*

■ This court possesses all of the powers of a federal district court.[52] Thus, it has at its disposal the full equity powers of a district court. Although there have been few occasions such as this in which to apply these powers, the history of the court supports using equity powers when appropriate. Since its inception, this court has applied the principles of equity to the cases before it. In *The Valuation Proceedings*,[53] this court used the principles of equity to determine a "fair" and "just" value of the assets transferred under the FSP.[54] Although this case is admittedly very different, *The Valuation Proceedings* serve to illustrate this court's long history of applying the principles of equity.

Moreover, this court has already expressed its willingness to use the principles of equity in circumstances very similar to those in the instant case. In *Consolidated Rail Corporation v. Penn Central Corporation*,[55] Penn Central transferred rail properties owned by its partial subsidiary, the Canadian Southern Railway Company ("CSR"), to Conrail. Penn Central was ordered to transfer both its stock in CSR as well as its creditor interests in advances it had made to CSR and gold bonds that had been issued to CSR. Similar to the instant case, the conveyance reserved Penn Central's right to receive any funds distributed on account of Penn Central's creditor interests.[56] In a subsequent side agreement between Penn Central and Conrail, Penn Central also conveyed the rights reserved in its favor by the convey-ance, its right to receive any distributions on the bonds and advances, to Conrail.

Conrail eventually demanded that it be given physical possession of the documents which represented Penn Central's interests in the advances and bonds. Penn Central refused and Conrail filed suit. Penn Central contended that although it had transferred its creditor interests in CSR to Conrail, by reserving its right to the proceeds from these interests, the conveyance allowed it to retain possession of the documents. This court held in favor of Conrail. However, Judge Friendly, for the court, stated that but for Penn Central's voluntary settlement with Conrail, it would have acted in equity if necessary to protect Penn Central's right to receive these proceeds if they were ever distributed by setting up an "escrow arrangement".[57] In short, had Penn Central and Conrail not entered a separate agreement transferring Penn Central's reserved right to repayment, this court would have taken steps to preserve that right, if necessary, by invoking the principles of equity. A step that we now take today.

■ The conveyance intentionally stripped Penn Central of its right to control the timing of repayment; however, the conveyance was not drafted in a vacuum. At the time it was drafted, there were to be three proprietors of CUSCO after the Penn Central conveyance: Amtrak, BN and MR. Further, CUSCO was not only not profitable, it was doubtful that it would ever become so. Both of these circumstances have changed. Now, Amtrak solely controls CUSCO's substantial profits. Moreover, Amtrak has

---

52. Section 209 of the Rail Act, 45 U.S.C. § 719 (1988); *Schuler v. Patton*, 416 F.Supp. 1252, 1254 (Sp.Ct.R.R.R.A.1976).

53. *Matter of Valuation Proceedings Under Sections 303(C) and 306 of the Regional Rail Reorganization Act of 1973*, 591 F.Supp. 651, 654 (Sp. Ct.R.R.R.A.1984). This is one of several "valuation proceedings" cases.

54. The Rail Act instructed this court to determine what was "fair and equitable" compensation for the assets transferred under the FSP. 45 U.S.C. § 743(c)(1). If the court found that the compensation provided was not fair and equitable, it was then empowered to enter a judgement against the transferee "if the judgment would not

endanger the viability or solvency of the [transferee]". 45 U.S.C. § 743(c)(2)(C).

55. 582 F.Supp. 1540 (Sp.Ct.R.R.R.A.1984).

56. *Id.* at 1541.

57. *Id.* at 1544. Although this case offers ample support for this court's power to use the principles of equity where appropriate, it does not resolve the dispute in this case. Penn Central has not asked this court to protect its ultimate right to receive any proceeds distributed by CUSCO on account of Penn Central's advances; rather it urges this court to rely on equitable principles to force CUSCO to repay Penn Central's advances at this time.

made it clear that it feels absolutely no inclination to cause CUSCO to repay Penn Central's advances.[58] Consequently, Penn Central argues that the principles of equity require this court to grant it relief. We agree.

First, CUSCO has become a highly profitable corporation.[59] This newly acquired profitability arises principally from the development of CUSCO's vast real estate holdings.[60] Consequently, CUSCO has large amounts of excess funds with which it could begin to repay Penn Central's advances without jeopardizing its rail services.

Second, CUSCO and Amtrak are for all practical purposes no longer separate entities. Amtrak and CUSCO observe the formal requirements of maintaining separate legal identities; however, since 1984, CUSCO has been and continues to be completely controlled by Amtrak. When Amtrak purchased BN and MR's CUSCO stock and creditor interests (the right to receive repayment on their advances made as proprietors), it foreclosed the possibility that these outside creditor/stockholders would cause CUSCO to repay the advances. Moreover, Amtrak has completely integrated CUSCO into itself. CUSCO no longer has a separate board of directors; each current member is now an Amtrak officer. CUSCO makes no financial decisions except at the request of Amtrak.

Hence, CUSCO will not repay Penn Central's advances until and unless Amtrak directs it to do so.[61]

As Penn Central points out, these are significant changes that have occurred since the conveyance was drafted. Penn Central argues that these changes are so dramatic that they have created the need for equitable relief if Penn Central's right to receive repayment is ever to be given any effect. We agree.

Penn Central offers two alternative equitable theories under which it argues for recovery. First, Penn Central argues that in the light of the changed circumstances, failing to grant restitution of its advances to CUSCO will result in CUSCO's being unjustly enriched. Second, Penn Central argues that the court should impose a constructive trust on the advances to protect Penn Central's interests as "beneficial owner". Because we agree with the first of Penn Central's theories, we need not address the second.

■■■■ Penn Central argues that even in the absence of any affirmative contractual duty, CUSCO is obligated to repay the advances made to it by Penn Central to avoid unjust enrichment.[62] We agree. Restitution is proper whenever "one person has received money under such circumstances that in equity and good conscience, he ought not retain

58. *See, e.g.,* Transcript of Oral Argument, June 14, 1993, pp. 23–24.

59. Amtrak disputes this finding. It maintains, in the face of substantial evidence to the contrary, that CUSCO is not so profitable as to enable it to repay the advances without jeopardizing rail service. Amtrak focuses solely on CUSCO's ability to repay all 17.5 million dollars in advances immediately—bemoaning CUSCO's inability to *borrow* the funds necessary to do this. This line of defense overlooks the possibility of CUSCO's repaying the advances over time as funds are generated from its real estate holdings. Further, it presupposes that all of Amtrak's massive plans for refurbishing the CUSCO facilities must be completed before any funds from the real estate holdings could be applied towards repaying Penn Central's advances.

60. Penn Central also points out that CUSCO's rail operations currently generate enough revenues to cover its operating expenses. Thus, any profits realized from its real estate holdings are

pure excess as they are not needed to help fund the rail services CUSCO provides.

61. The parties dispute Amtrak's motivation for buying out BN and MR's interests in CUSCO. Penn Central maintains that Amtrak was motivated in large part by the desire to avoid triggering Penn Central's right to repayment of its advances. Penn Central offers ample support for this contention. However, resolution of this dispute is not necessary to our analysis. Regardless of why Amtrak obtained full control of CUSCO, the fact remains that it did obtain full control in 1984 by purchasing BN and MR's interests.

62. Unjust enrichment is "an indefinable idea in the same way that justice is indefinable. But many meanings of justice are derived from a sense of injustice, and this is true of restitution since attention is centered on the prevention of injustice. Not all injustice but rather one special variety: the unjust enrichment of one person at the expense of another". George E. Palmer, Law of Restitution § 1.1, at 5 (1978 & Supp. 1990).

it".[63] Even where there has been no breach of duty or wrongdoing, restitution may be necessary to avoid unjust enrichment.[64]

The term 'unjust enrichment' "is founded upon the equitable principle that a person should not be allowed to enrich himself unjustly at the expense of another".[65] "Historically it arose in actions to recover on an implied or quasi-contract."[66] The Second Circuit has stated that unjust enrichment applies "in situations where no legal contract exists, 'but where the person sought to be charged is in possession of money or property which in good conscience and justice he should not retain, but should deliver to another' ".[67]

Similarly, the Seventh Circuit has remarked that "[w]hen justice requires it, quasi-contract will serve as the remedy for unjust enrichment".[68] Again, in *Midcoast Aviation*, the Seventh Circuit stated that "[q]uasi-contractual duties arise only in situations of unjust enrichment, situations where 'one person has received money or its equivalent under such circumstances that in equity and good conscience he ought not to retain it ...' ".[69] Such a situation exists in the instant case; CUSCO has received money that "in equity and good conscience" should not be retained but rather returned to Penn Central.[70] The Seventh Circuit went on to say that quasi-contract "impose[s] an obligation to pay money to the benefit provider, an obligation 'closely akin to a duty to make restitution' ".[71]

Penn Central has no recourse at law to demand repayment of the advances. Nonetheless, we find that the 1915 and 1963 proprietors' agreements reflect CUSCO's agreement to repay its proprietors' advances once all of the guaranteed debt is retired and CUSCO is financially able to pay. These events have come to pass. CUSCO, due to its real estate revenues, is in a position to begin repayment of the advances. Although

**63.** *M.J. McCarthy Motor Sales Co. v. Van C. Argiris & Co.*, 78 Ill.App.3d 725, 33 Ill.Dec. 529, 533, 396 N.E.2d 1253, 1257 (1979). *See also* American Law Institute, Restatement of Restitution § 1 (1937) ("A person who has been unjustly enriched at the expense of another is required to make restitution to the other.... A person is unjustly enriched if the retention of the benefit would be unjust"); *Midcoast Aviation, Inc. v. General Elec. Credit Corp.*, 907 F.2d 732 (7th Cir.1990) ("A claim in quasi-contract is established when 'the defendant has unjustly retained a benefit to the plaintiff's detriment, and ... [the] defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience.' ") *Id.* at 737 (quoting *HPI Health Care Serv., Inc. v. Mt. Vernon Hosp.*, 131 Ill.2d 145, 137 Ill.Dec. 19, 25, 545 N.E.2d 672, 678 (1989).)

**64.** *See* Arthur L. Corbin, Corbin on Contracts § 1104, at 558 (1964); Restatement (Second) of Restitution, (Tent.Draft No. 1, 1983) introductory note, at 7 and § 1, at 10 ("Often a person owes restitution for a benefit he received through entirely innocent behavior...."); Restatement of Restitution, Quasi Contracts and Constructive Trusts Ch. 7 Introductory Note, at 522 (1937) ("Restitution does not require a wrong by the person who has received the property...."); George E. Palmer, Law of Restitution § 1.7, at 40–44 (1978 & Supp.1992); Wendy J. Gordon, *On Owning Information: Intellectual Property and the Restitutionary Impulse*, 78 Va.L.Rev. 149, 199 (1992) ("A review of the Restatement of Restitution—and related materials and cases—reveals no particular kind of nastiness that must be proven to support a restitution recovery.

Cases of fraud, violations of fiduciary duties and the like, give rise to restitution, but so do cases in which there is no wrong at all. Yet the concept of unjust enrichment is not empty. Speaking descriptively and very generally, independently based unjust enrichment appears to include enrichments that are not wrongful so long as they: (1) are unearned and unrecompensed; (2) result from the labor or other resources of [the] plaintiff; (3) are not transferred to the defendant to satisfy one's legal duty or with donative intent; and (4) occur in contexts where reasons to deny restitution are absent." (Citations omitted)). The facts in the instant case satisfy all four of these criteria.

**65.** *Indyk v. Habib Bank Ltd.*, 694 F.2d 54, 57 (2d Cir.1982) (quoting *Matarese v. Moore–McCormack Line*, 158 F.2d 631, 634 (2d Cir.1946)).

**66.** *Id.* (citing 50 N.Y.Jur.Restitution and Implied Contracts § 3, at 150–51 (1966)).

**67.** *Id.*

**68.** *Gulf Oil Trading Co. v. Creole Supply*, 596 F.2d 515, 520 (7th Cir.1979) (citing 1 Williston on Contracts § 3A (3d ed. 1957)).

**69.** *Midcoast Aviation*, 907 F.2d at 737 (quoting *Board of Highway Comm'rs v. City of Bloomington*, 253 Ill. 164, 97 N.E. 280, 285 (1911)).

**70.** *Id.*

**71.** *Id.*

Penn Central no longer holds any contractual rights under the proprietors' agreements, any further retention of the advances will unjustly enrich CUSCO at the expense of Penn Central.

Federal courts have ordered restitution to prevent unjust enrichment in contexts factually dissimilar, but analogous to the instant case. For example, in *Provident Life and Accident Ins. Co. v. Waller*,[72] a self-funded employee benefit plan authorized the fund to advance to plan participants money for medical expenses for injuries for which third parties were liable, provided that the fund obtained from the participants an agreement to repay the advances upon the participant's recovery from the third party. The fund advanced Waller money for medical costs after she was injured in a car accident for which a third party was liable, but failed to obtain from Waller an agreement to repay the money. Waller later recovered damages from the third party in excess of the plan's advances, but refused to reimburse the fund.

The Court relied on the equitable principle of unjust enrichment and reversed the district court's ruling that failure to comply with the terms of the plan barred recovery of the advanced expenses. To show unjust enrichment, the Court reasoned that the fund had to show (1) the fund had a reasonable expectation of recovering the advance, (2) Waller should reasonably have expected to repay the advance, and (3) "society's reasonable expectations of person and property would be defeated by nonpayment".[73] The Court found that these factors were satisfied and that even though the fund was unable to legally or contractually compel repayment of the advance, it was entitled to be reimbursed to prevent the unjust enrichment of Waller.[74]

The principles employed in compelling restitution in *Waller* apply with equal force in the instant case. First, we find that

Penn Central had a reasonable expectation to recover its advances as soon as CUSCO retired its debt and became financially able to pay. Second, CUSCO has been aware of this obligation and should reasonably have expected to repay the advances. Third, equity and the interests of society will be served by repayment of the advances owed.

CUSCO admittedly owes over $17.5 million on account of Penn Central's advances;[75] Penn Central has the right to receive payment when and if CUSCO distributes funds on account of that debt. The problem is that CUSCO's 100% owner (Amtrak) has no incentive to cause CUSCO to repay the debt. As the legal owner of Penn Central's creditor interests and as sole shareholder, Amtrak alone has the legal, contractual, right to cause a distribution by CUSCO on that debt. Because Amtrak receives the benefit of CUSCO's profits simply by its 100% ownership of CUSCO, it is in Amtrak's best interests *never* to cause a distribution on account of Penn Central's advances. This presents a "catch twenty-two" situation. Equity eliminates the injustice caused by such a situation and demands restitution of the advances to prevent the unjust enrichment of CUSCO.

If CUSCO is not required by this court to repay Penn Central's advances, it will be unjustly enriched by further retention of the funds. Although CUSCO has no contractual obligation to repay Penn Central's advances, *equity* requires CUSCO to repay the advances now that it is financially capable of doing so without threatening its rail services or even threatening its refurbishment of its facilities.[76]

The defendants' attempt to characterize Penn Central's request for equitable relief as a request for modification of the conveyance order. This characterization is unwarrant-

---

72. 906 F.2d 985 (4th Cir.1990).

73. *Id.* at 993–94.

74. *Id.* at 993.

75. Technically, CUSCO owes this money to Amtrak, the legal owner of Penn Central's creditor interests.

76. CUSCO has already spent tens of millions of dollars redoing its facilities. It maintains that another 55 million must be spent to complete its grandiose plans. CUSCO seems unable to consider the possibility of funnelling some, not all, of its real estate earnings towards repaying Penn Central.

ed.[77] In addition, the defendants argue that Penn Central is not entitled to equitable relief because it was *compensated* for the transfer of its creditor interests in the settlement agreement made in conjunction with *The Valuation Proceedings.* According to Amtrak, because Penn Central was compensated for its interests, CUSCO will not be unjustly enriched by retaining the advances indefinitely. We are not persuaded. As Penn Central points out, it cannot have been compensated for what it never transferred. Penn Central did not transfer its right to any funds distributed on account of the advances, it merely transferred its legal right to control the timing of the repayment.

### III.

■ Penn Central argues that it is entitled to prejudgment interest calculated from the formal date of demand made in 1988. Further, it contends that this interest should be calculated according to Illinois law at 5% per annum.[78] We reject this contention. Because we decline to award Penn Central prejudgment interest, we need not determine what law would govern such interest if awarded.

We do not hold that Penn Central retained a legal right to demand repayment on its advances. Thus, the funds have not been "owed" since the date of demand. Rather, we hold that equity requires CUSCO to begin returning the funds to Penn Central as of the date of this judgment. Thus, prejudgment interest is not appropriate. Further, we decline to discuss the collateral issue of post-judgment interest in the hopes that the parties will reach a reasonable settlement concerning this issue.

### IV.

Penn Central's conveyance of its creditor interests in CUSCO stripped it of the legal right to demand payment on its advances. The circumstances surrounding this conveyance, however, have changed. Equity requires that CUSCO return Penn Central's funds to avoid being unjustly enriched. Thus, we hold that Penn Central is entitled to repayment of its advances. Moreover, we find that CUSCO is capable of making repayment out of at least some portion of its real estate revenues generated each year. Reasonable parties to this litigation should be able to agree on a schedule of repayment.

Counsel should agree upon and submit a form of judgment order giving effect to our ruling in this action.[79]

---

**77.** First, the defendants argue that Penn Central waived any right to modify the terms of the FSP or the conveyance documents. The cut off date for such a request was July 1, 1977. The defendants, however, mix apples with oranges. Granting equitable relief is not synonymous with modifying the terms of the FSP or the conveyance documents.

Similarly, Amtrak and CUSCO liken Penn Central's request for equitable relief to a request for a modification of a court order. Amtrak notes that Penn Central must carry a heavy burden to justify a modification: (1) Penn Central must show that the order caused extreme hardship, (2) the injustice resulted from unforeseeable changes since the order was implemented, and (3) the dangers the order intended to foreclose have disappeared. Amtrak then maintains that the changes in circumstance were foreseeable, Penn

Central has suffered no hardship, and finally the dangers contemplated by the "order" (the conveyance) are still present.

Without reaching the merits of this argument, we note that the entire argument rests on a faulty premise, that Penn Central's request for equitable relief constitutes a request to modify the conveyance document and the FSP. This is not the case.

**78.** Ill.Rev.Stat. ch. 17, ¶ 6402 (1991) provides that interest shall be calculated at 5% per annum from the date that a sum certain becomes due.

**79.** We note, for counsel's benefit, that we do not require CUSCO to immediately repay all of the $17.5 million in advances at once. Further, we do not suggest that CUSCO be compelled to borrow funds to cover repayment.