[686 NYS2d 24]

REGENT CORPORATION, U.S.A., Respondent, v AZMAT BANG-
LADESH, LTD., et al., Defendants, and INTERNATIONAL
FINANCE INVESTMENT AND COMMERCE BANK LIMITED, Ap-
pellant.

First Department, March 2, 1999

**APPEARANCES OF COUNSEL**

*Alan Heblack* of counsel (*Ana C. Davis* on the brief; *Holland & Knight, L. L. P.,* attorneys), for respondent.

*Martin L. Brothers* for appellant.

**OPINION OF THE COURT**

NARDELLI, J.

Plaintiff, Regent Corporation, U.S.A. (Regent), is a New York corporation which imports finished textile products for resale in the United States. In March and April 1994, Regent

contracted with Azmat Bangladesh, Ltd. (Azmat), a textile company located in Bangladesh, for the purchase of bed sheets and pillow cases for import and resale into the United States. An essential condition of the sale was that the goods be manufactured in Bangladesh since such goods were not subject to quota restrictions. However, upon their delivery to New Jersey, United States Customs refused entry for the reason that the goods required a visa designating Pakistan as the country of origin.

The contract between Regent and Azmat required payment by Regent by "100% confirmed irrevocable letter of credit, 90 days from bill of lading date," to be drawn upon by Azmat after it presented documents, including the bill of lading, and an export visa stamp showing the goods originated in Bangladesh. Regent obtained the necessary letters of credit from the Bank of New York and Citibank. Defendant-appellant, International Finance Investment and Commerce Bank Limited (International Bank), acted as Azmat's advising bank, and between April and June 1994, it presented drafts and relevant documents to Citibank and The Bank of New York for payment. Each draft indicated that payment was to be made "at 90 days deferred from bill of lading date" and was accompanied by a dated bill of lading. The Bank of New York made partial payment and Citibank notified International Bank that the requirements for partial payment under its letter of credit were met and indicated it would pay International Bank the amounts requested when due.

However, as noted, the goods were detained for inspection by United States Customs at the port of Newark on the ground they were not manufactured in Bangladesh, but in Pakistan, and therefore Regent sought to enjoin The Bank of New York and Citibank from further payments on the letters of credit, claiming fraud in the transaction by Azmat. International Bank intervened after Regent commenced this action against Azmat, Bank of New York and Citibank. Thereafter, Regent served an amended complaint asserting, *inter alia*, a first cause of action for fraud against Azmat and International Bank and thereafter sought partial summary judgment on International Bank's liability.

In support of this motion, an affidavit by Hafeez Azmat was submitted to the effect that the goods sold to Regent were not manufactured entirely in Bangladesh and did not satisfy Customs regulations. As of June 1994, Azmat's looms had not been fully operational for several months and could not weave

fabric for yarn. As a result, to fill the order from Regent, Azmat was required to use "griege goods," i.e., unfinished goods, which were woven in Pakistan and shipped to Azmat for processing. Azmat printed, cut, hemmed and packaged the griege goods in Bangladesh, but the goods were not dyed in either Bangladesh or Pakistan. Azmat also noted in his affidavit that Customs had visited his facility in Bangladesh and seen that the looms necessary for weaving and dyeing and printing were not operational. He also noted that Customs had advised him during the visit that his finishing operations were insufficient to qualify as goods "made in Bangladesh."

Also in support of the motion, Regent submitted an affidavit from J. Robert Dorsett, an import specialist with the Office of Field Operations for the United States Customs Service. Dorsett indicated that he had visited the Azmat facilities in Bangladesh in the beginning of June 1994 to determine whether the textiles were manufactured or processed there. At the conclusion of this inquiry, he wrote, edited and filed a June 24, 1994 report, which he annexed. This report indicated that only 17 of Azmat's 202 looms were producing fabric during his visit. One hundred looms were rusted and not useable. Thirty-three looms had yarn set up but were not operating and 50 looms were idle, showing no signs of recent use. Dorsett also noted there were Pakistani invoices for fabric with widths commonly used for American-sized beds and there were sufficient quantities of that fabric to cut and sew about 2.2 million bed sheets for United States export. Azmat processed these sheets by bleaching and printing them, cutting them on two sides and hemming them, which did *not* satisfy Customs regulations for the "substantial transformation" of a product. During Dorsett's visit, Hafeez Azmat called to ask how to prevent problems with United States and Bangladesh authorities. Dorsett told Azmat that to be a Bangladesh product, the Pakistani fabric would have to be substantially transformed in Bangladesh by either (a) weaving or cutting on four sides plus additional work such as adding elastic, piping, ruffles, etc., or (b) by "dyeing *and* printing." After learning that Dorsett had obtained the records of fabric shipments from Pakistan, Azmat admitted the fabric for the sheet shipment to the United States was woven in Pakistan.

The IAS Court granted Regent's motion for partial summary judgment against International Bank on the issue of liability and denied International Bank's cross motion for a commission to take depositions in Bangladesh. Thus, the motion court

determined that the affidavit of Hafeez Azmat demonstrated he knew the requirements for goods to qualify as being made in Bangladesh but shipped goods which did *not* meet those requirements with the intent to deceive Regent, which constituted fraud in the transaction. The court found that each draft declared on its face that it was payable a specified number of days subsequent to the bill of lading date on another writing, and that, therefore, the drafts were nonnegotiable instruments. Since it found these drafts to be nonnegotiable instruments, the court concluded that International Bank could not be a holder in due course and was a mere transferee of a claim. In light of the findings of fraud, the court denied the cross motion by the Bank for a closed commission to depose former Azmat employees in Bangladesh on that issue.

■ International Bank asserts that the affidavit of Hafeez Azmat was procured by fraud. In support of this, the Bank submitted an unsworn letter from the attorneys for Azmat. However, absent an affidavit from Azmat himself, this evidence was not in admissible form and failed to raise any triable issue of fact (*see, Friends of Animals v Associated Fur Mfrs.*, 46 NY2d 1065). In addition, the Bank claimed that the report by the Customs agent, Dorsett, was inadmissible because International Bank could not depose or cross-examine Customs officials. However, the report was properly admissible as a business record pursuant to CPLR 4518. Dorsett attested to the fact that it was made in the regular course of business, that it was his duty to make it, and that it was accurate as to Azmat. In addition, the report was clearly made within a reasonable time after Dorsett's inspection of the Azmat facility. While International Bank claimed it could not depose Dorsett or subpoena him, it offered no evidence to support this contention. In addition, while the Bank objected to redactions in portions of the report, Dorsett attested that the redactions only concerned persons, places and entities which were unconnected to Azmat.

■ Finally, we agree with the contention of plaintiff that since International Bank failed to appeal Customs's rejection of the goods, Customs's determination was final and binding on the issue of whether the goods were manufactured in Bangladesh or in Pakistan, and the Customs's determination cannot be challenged in this Court (*see, United States v Utex Intl.*, 857 F2d 1408, 1412). Absent a timely protest, Customs' determination is final as to all aspects of the entry and the importer, surety and government are bound by and have the right to rely

on its finality (*supra; see also, R.J.F. Fabrics v United States*, 651 F Supp 1431, 1435 [Ct of Intl Trade] [action which requires a determination as to country of origin of merchandise excluded for possible violations of quota requirements is the type of matter that should be decided only in the Court of International Trade]). In any event, International Bank's attempt to show that Customs erred in applying 19 CFR 12.130 (e) in finding that the goods were not "substantially transformed" in Bangladesh was, on its face, without evidentiary support. International Bank asserts that material will be the product of a foreign country when, prior to importation to the United States, it has undergone, *inter alia*: "[d]yeing of fabric *and* printing when accompanied by two or more of the following finishing operations: *bleaching*, shrinking, fulling, napping, decating, *permanent stiffening*, weighting, permanent embossing or moireing" (19 CFR 12.130 [e] [1] [i]; emphasis added).

The Bank asserts that there was permanent stiffening, as noted above, and bleaching of the goods. However, there is a dispute as to the stiffening, with Regent pointing out there was some stiffening, but *not permanent* stiffening. In any event, there is no dispute that there was no dyeing of the fabric. Thus, the terms of the section have *not* been met since it requires dyeing of the fabric *and* printing when accompanied by two or more of the other processes.

■ Because of these evidentiary submissions and the failure of International Bank to raise any triable issue, Regent demonstrated, and the IAS Court properly determined, that there was fraud in the transaction at issue. Thus, Regent showed that a material term of the contract was that the goods be manufactured in Bangladesh; that Hafeez Azmat knew what the regulations required for "substantial transformation" of the goods; that due to its economic situation, Azmat's factory was incapable of dyeing the goods; that Hafeez Azmat knowingly failed to fulfill Customs requirements due to the economic pressures on his factory; that Hafeez Azamt knew that the goods he shipped to Regent would not qualify as being manufactured in Bangladesh; and that, nonetheless, Hafeez Azmat sent Regent documents attesting that the goods were made in Bangladesh in order to be paid on the shipment. While International Bank asserts that Azmat *attempted* to comply with Customs regulations and that a good-faith mistake resulted in nonconforming goods, this contention is belied by the affidavit of Hafeez Azmat, which contained binding admissions demonstrating fraud by Azmat on Regent (*Spett v President Monroe*

*Bldg. & Mfg. Corp.*, 19 NY2d 203; *Johnson v Hallam Enters.*, 208 AD2d 1110, 1111).

■ However, we find that the IAS Court erred in determining that the drafts presented by International Bank did *not* constitute negotiable instruments. The requirements for negotiability (concerning the form and content of the instrument itself) are set out in Uniform Commercial Code § 3-104 (1) (*see, DH Cattle Holdings Co. v Smith*, 195 AD2d 202, 209-210). Pursuant to UCC 3-104 (1) (c), a negotiable instrument must "be payable on demand or at a definite time." This "definite time" is defined by UCC 3-109 (1) as, *inter alia*, "at a fixed period after a stated date" or "at a fixed period after sight" (UCC 3-109 [1] [a], [b]). While the indicia of negotiability must be visible on the face of the instrument, a note containing an otherwise unconditional promise is not made conditional merely because it refers to, or states that it arises from, a separate agreement or transaction (*see, A.I. Trade Fin. v Laminaciones de Lesaca,* 41 F3d 830, 833, 836).

The drafts herein were payable at fixed periods after sight in conformity with UCC 3-109 (1) (b). Thus, they were payable within 90 days of the dated bills of lading which accompanied them. The notes, which are by their terms to be paid a certain number of days *after* the date of the bill of lading, are, therefore, negotiable and the mere reference to the bill of lading date does not impair the note's negotiability (*A.I. Trade Fin. v Laminaciones de Lesaca, supra*). Accordingly, since the drafts at issue constituted negotiable instruments, the issue that must then be determined is whether International Bank was a holder in due course of the drafts.

■ Where a presenter of drafts under a letter of credit claims to be a holder in due course, the defenses it remains subject to are those available under UCC 5-114 (2), i.e., noncompliance of required documents, forged or fraudulent documents, or fraud in the transaction (*see, United Bank v Cambridge Sporting Goods Corp.*, 41 NY2d 254, 261-262). These defenses operate to place the burden of proof of holder in due course status upon the party asserting such status. Thus, "[a]fter it is shown that a defense exists a person claiming the rights of a holder in due course has the burden of establishing that he or some person under whom he claims is in all respects a holder in due course" (UCC 3-307 [3]). That party has the full burden of proof by a preponderance of the total evidence which must be sustained by affirmative proof (*United Bank v Cambridge Sporting Goods Corp., supra*, at 261-262).

Pursuant to UCC 3-302 (1), a holder in due course is (1) a holder, (2) who takes a negotiable instrument (3) for value, (4) in good faith, and (5) without notice that the instrument is overdue or has been dishonored, or of any defense or claim against it on the part of another (*see, Chemical Bank v Haskell*, 51 NY2d 85, 91; *DH Cattle Holdings Co. v Smith, supra,* at 209). Here, International Bank demonstrated possession of the bill of lading and of the sight draft payable to it, which we have held constitutes a "negotiable" instrument. In addition, the parties do not contest the fact that the Bank gave value for the drafts. As a result, only the fourth and fifth elements concerning the Bank's good faith and knowledge are in dispute.

The inquiry into "good faith" as defined by UCC 3-302 is what, in fact, the holder *actually* knew (*Chemical Bank v Haskell, supra,* at 91-92). If the Bank did not have actual knowledge of some fact which would prevent a commercially honest individual from taking the drafts, then its good faith would be sufficiently shown. Constructive knowledge is insufficient and it is irrelevant what a reasonable banker in International Bank's position should have known or should have inquired about (*supra,* at 91-92).

With respect to the element of notice of Regent's claims and defenses, a subjective test also applies and also requires a showing of the Bank's actual knowledge (*see, Chemical Bank v Haskell, supra*, at 92).

In this case, plaintiff relied on evidence consisting of International Bank's knowledge in 1992 that Azmat had misused the Bank's credit facility; the Bank's involvement in separate litigation where Azmat allegedly committed a similar fraud and International Bank's efforts to insure repayment of Azmat's credit facility with it, which included documents indicating that the Bank intended to post people at the Azmat facility to monitor Azmat's export and stock; the Bank's instructions to Hafeez Azmat to expedite the shipment of all outstanding orders in order to collect on the letters of credit; and evidence that Hafeez Azmat and an International Bank manager were in daily or almost daily contact. However, this evidence, although impressive, does not demonstrate clearly that the International Bank had *actual* knowledge of Azmat's fraud. Thus, they do not actually indicate that in fact the Bank did post someone at Azmat's facility. They also did not indicate the content of the daily communication between the Bank's branch manager and Hafeez Azmat. Finally, the documents suggest, but do not clearly indicate, that the Bank was aware that

Azmat's license had been suspended for "irregularities" stemming from the other litigation. However, "The most that can be said of the testimony offered to controvert [the Bank's] position is that it indicated suspicious circumstances which might well have induced a prudent banker to investigate more thoroughly than did [the Bank] before taking the notes. However, as has been previously indicated, this is not enough. [The Bank] was not bound to be ' "alert for circumstances which might possibly excite the suspicions of wary vigilance" ' (*Hall v Bank of Blasdell*, 306 NY 336, 341, *supra*)." (*Chemical Bank v Haskell*, *supra*, at 93.)

Thus, the evidence submitted by plaintiff creates an issue of fact concerning the Bank's holder in due course status (*American Inv. Bank v Hutchings*, 239 AD2d 207; *American Inv. Bank v Dobbin*, 209 AD2d 780).

Although International Bank claims the motion court also erred in attaching unidentified assets, the Bank did not appeal from the order of attachment and the record does not contain the underlying papers relating to that order. Thus, that issue cannot be addressed herein.

Accordingly, the order of the Supreme Court, New York County (Herman Cahn, J.), entered on or about May 16, 1997, which, *inter alia*, granted plaintiff's motion for partial summary judgment on the issue of liability against defendant International Finance Investment and Commerce Bank Limited, should be modified, on the law, to deny plaintiff's motion for partial summary judgment on the issue of liability against the Bank, and otherwise affirmed, without costs, and the matter remanded for further proceedings.

SULLIVAN, J. P., TOM and MAZZARELLI, JJ., concur.

Order, Supreme Court, New York County, entered on or about May 16, 1997, modified, on the law, to deny plaintiff's motion for partial summary judgment on the issue of liability against defendant-appellant, and otherwise affirmed, without costs, and the matter remanded for further proceedings.