In re APPONLINE.COM, INC. and Island Mortgage Network, Inc., Debtor.

Broward Title Company, a Florida Corporation, Plaintiff,

v.

Alan Jacobs, as Trustee of Island Mortgage Network, Inc., Debtor, HSA Residential Mortgage Services of Texas, Inc., a corporation and Matrix Capital Bank, a Federal Banking institution, Defendant.

Bankruptcy Nos. 800–84686–478, 800–84687–478.
Adversary No. 801–8181–478.

United States Bankruptcy Court, E.D. New York.

Dec. 4, 2002.

Gossett & Gossett, P.A., By Robert L. Gossett, Hollywood, FL, for Plaintiff.

Shearman & Sterling, By James L. Garrity Jr., New York City, for HSA Residential Mortgage Service of Texas.

Kramer, Levin, Naftalis & Frankel, LLP, By P. Bradley O'Neill, New York City, for the Defendant Trustee.

Arter & Hadden, Los Angeles, CA, for HSA Residential Mortgage Service of Texas.

Harold, Salant, Strassfield, et al., By Leonard I. Spielberg, White Plains, NY, for David Duboff, P.C.

Wachtel & Masyr, LLP, By Stephen Cohen, New York City, for Matrix Capital Bank.

**Memorandum Decision and Order**

DOROTHY EISENBERG, Bankruptcy Judge.

This is an adversary proceeding brought by Broward Title Company ("Plaintiff" or "Broward") against various entities, including HSA Residential Mortgage Services of Texas, Inc. ("RMST") and Matrix Capital Bank ("Matrix"). This proceeding arises out of two loan closings conducted by Broward and at which Broward acted as disbursing agent: the Amarante Loan and the Ciceron Loan (defined below). Matrix claims that it is entitled to the proceeds of the Amarante Loan as a holder in due course of the Amarante Note and Amarante Mortgage (as defined below), and RMST claims that it is entitled to the proceeds of the Ciceron Loan as a holder in due course of the Ciceron Note and Ciceron Mortgage (as defined below). Broward asserts that it is the equitable owner of both the Amarante Note and Mortgage and the Ciceron Note and Mortgage. Broward filed its Statement of Claim on May 30, 2001 and Answers and Counterclaims were filed by RMST and Matrix on July 31, 2001 and August 24, 2001, respectively. The Plaintiff filed a Reply to RMST's and Matrix's Counterclaims on August 6, 2001 and November 20, 2001. Following discovery, this Court conducted an evidentiary hearing on July 22–23, 2002 and August 28, 2002. Thereafter, the parties submitted post-trial findings of fact and conclusions of law, as well

as numerous memoranda of law. The following constitutes the Court's findings of fact and conclusions of law as mandated by Fed. R. Bankr.P. 7052.

### Background

**The Parties.**

1. Alan M. Jacobs is the Court appointed Chapter 11 Trustee of AppOnline.com, Inc. ("AppOnline") and Island Mortgage Network, Inc. ("Island Mortgage"). AppOnline is a holding company that, through its subsidiaries, engaged in the mortgage banking and brokerage business. Island Mortgage is a wholly-owned subsidiary of AppOnline.

2. Broward is a Florida corporation with its principal place of business in Hollywood, Florida. It is jointly owned by Robert L. Gossett and Ronald P. Gossett. Broward is a title insurance company engaged in the business of issuing real estate title insurance policies, in connection with which Broward conducts real estate closings and acts as a disbursing agent. Currently, and during the time period relevant to this adversary proceeding, Broward is a corporate title agent for Attorneys Title Insurance Fund. (Trial Tr. July 22 at 64).

3. Matrix is a federally chartered bank organized under the laws of the United States, with a principal place of business located in Las Cruces, New Mexico. Prior to the filing of these cases, Matrix provided warehouse loans to Island Mortgage to finance the origination of certain mortgage loans. For the purposes of this adversary proceeding, the parties have stipulated that Matrix is a secured creditor of Island Mortgage and claims a perfected security interest in the Amarante Note and Mortgage.

4. RMST is a Delaware corporation. Since May 1997, RMST provided warehouse loans to Island Mortgage to finance the origination of certain mortgage loans.

For the purposes of this adversary proceeding, the parties have stipulated that RMST is a secured creditor of Island Mortgage and claims a perfected security interest in the Ciceron Note and Mortgage.

5. National Settlement Services Corp. ("National Settlement") is a Delaware corporation which is a wholly-owned subsidiary of Action Abstract, Inc. ("Action Abstract").

6. Action Abstract is a New York corporation and is wholly owned by Robert Knickman, a director of AppOnline.

**Prior History.**

On July 19, 2000, AppOnline and Island Mortgage filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. On July 28, 2000, an involuntary bankruptcy petition was filed against Action Abstract by, *inter alia,* Matrix and RMST. On July 28, 2000, this Court granted the motion of certain creditors of those debtors seeking the appointment of a trustee. The United States Trustee thereafter appointed Alan M. Jacobs as Trustee of the estates of Island Mortgage and AppOnline. On June 20, 2001, at the direction of the Trustee, a Chapter 11 bankruptcy petition was filed for National Settlement. Thereafter, the Court issued an Order substantively consolidating the estates of Island Mortgage, AppOnline, Action Abstract and National Settlement (collectively, the "Bankruptcy Proceedings"). The Trustee has been appointed trustee in each of the Bankruptcy Proceedings.

Prior to commencement of the Bankruptcy Proceedings, Island Mortgage was a mortgage banker and broker that originated and sold hundreds of millions of dollars in mortgages annually. One of the mortgage loans that it originated was made to Gilbert Amarante and Susan

Amarante. Another one of the mortgage loans that it originated was made to Simaye Ciceron and Shirley Brown.

On December 14, 2000, this Court entered an order (the "Sales Procedures Order") which, among other things, approved bidding and auction procedures to govern the sale of certain mortgages. In accordance with the Sales Procedures Order, the Trustee sold a group of mortgages, including the mortgages which are the subject of this adversary proceeding, to Empire Mortgage IX, pursuant to this Court's order dated August 16, 2001. The net sales proceeds of these mortgages are being held in a segregated, interest-bearing account.

### Facts

### Broward and its Relationship with Island Mortgage

Robert Gossett, Esq., the President of Broward and a 50% shareholder, testified that Broward handled the closings for the transactions in question as a title company and that Broward's job was to close the contract, to follow the lender's instructions regarding the events which were to take place at the closing, to examine the title and to issue title insurance policies insuring that the owner actually owns the real property being transferred and to insure that the mortgage lender has a valid mortgage against the real property. (Trial Tr. July 22 at 63).

Broward has acted as a closing agent for Island Mortgage and its predecessors since at least 1998. (Broward Ex. 11). From October 26, 1999 through June 1, 2000, Broward closed at least 33 loans originated by Island Mortgage in which National Settlement issued the loan proceeds checks. Gossett testified that with respect to loans originated by Island Mort-

gage, Broward would normally receive the loan proceeds check[1] along with the closing documents at or about the morning of the date of the scheduled closing. (Trial Tr. July 22 at 72). Upon conclusion of the closing, an employee of Broward would prepare a deposit ticket and arrange for deposit of the loan proceeds check. Usually, the date on the deposit ticket would correspond with the date that the check would be shown on Broward's bank statement. In cases where the closing was not concluded until the afternoon, the deposit ticket would reflect the next day's date. According to Mr. Gossett, such deposit ticket would be dated the business day after the closing because the bank would not list the check for deposit on Broward's bank statement until that date. (Trial Tr. at 104).

With respect to at least eight of those mortgage closings for the period through and including June 1, 2000, in which the loan proceeds check was drawn on an account from National Settlement, the check initially provided was replaced by a second or third check because the initial check was either dishonored or had a stop payment order issued against it. (Broward Ex. 11). Island Mortgage's explanation for the stop payment orders on the checks was that Island Mortgage was experiencing a computer problem. (Trial Tr. July 22 at 179).

From June 1, 2000 until June 22, 2000, Broward closed three additional loans originated by Island Mortgage in which the loan proceeds checks were returned to Broward unpaid. (Matrix Exs. CC, DD).

### The Amarante Loan

On or about January 12, 2000, Matrix entered into a Mortgage Purchase/Repurchase Agreement (the "Matrix Purchase Agreement") with Island Mortgage Net-

---

**1.** These checks were usually not certified or bank checks, merely a promise to pay.

work, Inc. for the "sale" of residential mortgage loans to Matrix. (Matrix Ex. A). The Matrix Purchase Agreement contains the following pertinent language:

Section 2.01 Supporting Documentation.

(a) [Matrix] shall not be obligated to pay Seller until such time that [Matrix] receives the closing documentation from Seller and the file is approved by [Matrix].

   \*     \*     \*     \*     \*     \*

(c) All documentation shall be closed in the name of Seller and assigned to [Matrix].

Section 3.01 Delivery of Closing Documents.

(a) Seller shall deliver the loans to [Matrix] in purchasable form within 5 (five) days from [Matrix's] disbursement of loan proceeds to borrower.

Section 4.01 Payment of Purchase Price and Seller's Wire Instructions.

(a) [Matrix] shall, after receipt of a loan underwriting package which fully complies with the requirements of [Matrix's] underwriting guidelines, deliver to Seller in accordance with Seller's wiring instructions the 100% of the unpaid principal balance net of the prepaids and underwriting fee in the amount of $50.00.

(Matrix Ex. A).

On May 26, 2000, Matrix received from Island an "offer to sell" a certain proposed mortgage loan transaction between Island, as mortgagee, and Gilbert Amarante and Susan Amarante (the "Amarantes"), as mortgagors, in accordance with the Matrix Purchase Agreement (the "Offer to Sell"). (Matrix Ex. B). Pursuant to the Offer to Sell, Island agreed to "sell" to Matrix the Amarante mortgage under, *inter alia,* the following conditions:

[Island] will instruct the title company or other Closer identified for each Mortgage listed on the schedule that (1) the Closer is and will be [Matrix's] bailee from the inception of the execution and delivery of each listed Mortgage's promissory note, and (2) to both (I) fax to [Matrix] at the time of the Mortgage's closing and (ii) promptly deliver to [Matrix], the promissory note and a certified copy of the mortgage or deed of trust for the Mortgage when it is closed. The Company hereby promises to deliver-or cause to be deliverd (sic)—to [Matrix], all other documents, with all necessary endorsements, required to satisfy all of the requirements of the applicable Commitment for each such Mortgage.

(Matrix Ex. B).

On the bottom of the Offer to Sell, the "Title Co." is listed as Action Abstract. Matrix accepted Island's offer to sell the Amarante mortgage and wired funds for the mortgage in the amount of the purchase price, to Action Abstract, in accordance with Island's instructions on May 30, 2000, prior to the scheduled closing. (Matrix Ex. C). The procedure followed by Matrix in wire transferring funds to Action Abstract prior to the scheduled closing was not in compliance with the Matrix Purchase Agreement, which states that Matrix shall not be obligated to pay Island Mortgage until Matrix has in its possession the closing documents executed by the Amarantes (including the original promissory note (the "Amarante Note")). In connection with the Amarante Loan, on May 31, 2000, on the day of the scheduled Amarante closing, Island transmitted to Broward by fax between 2:05 p.m. and 2:30 p.m. a certain group of documents entitled "Funding Instructions", "Closing Instructions and Information" and related documents (collectively, the "Matrix Closing Package"). (Matrix Ex. K). Included with the Matrix Closing Package was a commitment by Island to make a mortgage

loan to the Amarantes in the amount of $119,900. The Funding Instructions state that "no funds are to be disbursed until a funding number is received. Funding number (sic) are given on the day of the closing (refinances and purchases)." The Funding Instructions further state that "all funding numbers are to appear on the lower left hand corner of all disbursement checks." The Funding Instructions do not contain a requirement that the funding number be placed on the loan proceeds check provided to Broward by Island Mortgage, National Settlement or David Duboff, P.C.[2] A funding number would not be provided by Island Mortgage until Broward faxed to Island Mortgage a signed HUD–1 settlement statement, a signed promissory note, and a signed mortgage (the "Amarante Mortgage"), among other documents. (Trial Tr. July 22 at 163). Although the Amarante Mortgage was assigned a loan number by Island Mortgage and the loan number appeared on the loan documents, Island Mortgage advised Broward that no funding number would be issued because Island Mortgage was to fund this transaction by wire transfer. (Trial Tr. July 22 at 163).

Broward expected the loan proceeds for the Amarante Mortgage to be wired to it on May 31, 2002. However, the Amarante closing did not conclude on May 31, 2000 because Broward did not have certain documents needed from the absent sellers. The closing was postponed to June 1, 2000, and as of the time of the rescheduled closing, Broward had received missing documents from the sellers and instead of any wire transfer, had received a check drawn on the account of National Settlement dated June 1, 2002 in the sum of $115,117.61 representing the net proceeds of the loan.

(Matrix Ex. L). The mortgage note was prepared with a blank endorsement. The Amarantes executed the mortgage in favor of Island Mortgage and the note in favor of Island Mortgage at the closing on June 1, 2000. (Matrix Ex. M).

Broward disbursed money from its escrow account to pay off the pre-existing mortgage and to pay the sellers their net proceeds from the sale. The checks disbursed by Broward all were dated May 31, 2000. By deposit slip dated June 2, 2000, without placing a funding number on the check from the account of National Settlement, Broward deposited into its bank account the check for $115,117.61 that it received from Island Mortgage drawn on the National Settlement account dated June 1, 2000. On June 6, 2000 the net proceeds check was dishonored due to a stop payment order issued against the check. (Matrix Ex. L). On June 6, 2000, National Settlement sent a replacement check to Broward at its request, which check was dishonored as well due to a stop payment order issued against the check. ( Matrix Exs. W and X).

In the meantime, on June 1, 2000, Broward had transmitted the original Amarante Note and related closing documents to Matrix. On August 2, 2000, Matrix prepared and caused to be recorded an assignment of the Amarante Mortgage to Matrix, in accordance with a power of attorney given by Island to Matrix. (Matrix Exs. A. and P). At all relevant times after the Amarante closing, Matrix remained in possession of the Amarante Note. The Chapter 11 Trustee sold the Amarante mortgage loan to Empire Mortgage IX, Inc. pursuant to order of this Court, dated August 16, 2001. (Matrix Ex. BB).

---

**2.** National Settlement and David Duboff, P.C. often provided the check representing the loan proceeds on behalf of Island Mortgage.

### The Ciceron Loan

As of the commencement of this case, RMST was a party to a Mortgages Purchase Agreement with Island Mortgage dated January 31, 2001 (the "RMST Purchase Agreement"). (RMST Ex. 60). The RMST Purchase Agreement governs the rights of RMST and Island Mortgage under the transaction which is the subject of this adversary proceeding. Sections 12 and 13 of the RMST Purchase Agreement states as follows:

Section 12. Payment by Warehouse Purchasers. The purchase price for Eligible Mortgages shall be paid at the request of RMST by the Agent (I) to the Company [defined as Island Mortgage], in the case of Eligible Mortgages purchased after the Company has closed them; or (ii) in all other instances, by providing money for the original funding of the Mortgages directly to the title company or other person or entity handling the closing (the "**Closer**"), net of origination, discount points, and any other fees and other prepaid items the Company may stipulate. The payment will be made at the time and in the manner specified in the RMST Procedures.

Section 13. Advances by RMST. In its sole discretion, RMST may advance funds to the Company, in the case of Eligible Mortgages purchased after the Company has closed them, or to the Closer, in all other instances (especially advances to JRMK)[3], to pay amounts relating to the origination of a Mortgage. These funds so advanced (an "RMST Advance") are a loan from RMST to the Company, are secured by the security interest created by Section

39, bear interest at the Default Rate and are due on demand unless earlier repaid in connection with the sale of the Mortgage to which the RMST Advance relates.

(RMST Ex. 60).

On June 16, 2000, RMST received from Island Mortgage an "offer to sell" for a certain proposed residential real estate mortgage loan transaction between Island Mortgage and Simaye Ciceron and Shirley J. Brown (the "Ciceron Loan"). (RMST Ex. 104). RMST accepted the offer to sell the Ciceron Loan and wired funds for the Ciceron Loan on June 19, 2000 in the amount of the purchase price ($82,400) to Action Abstract. The Offer to Sell Mortgage for the Ciceron Loan identified Action Abstract as the "Closer" and directed RMST to wire the purchase price of the Ciceron Loan to the "Closer." (RMST Ex. 104). The RMST Purchase Agreement provided that if RMST was going to advance money to fund a mortgage loan, the money was to be sent by RMST "directly to the title company or other person or entity handling the closing (the 'Closer')." This requirement applied whether the transaction fell within Section 12 or Section 13 of the RMST Purchase Agreement, so long as the advance was made prior to the closing. (RMST Ex. 60). At the time RMST transferred the funds in question, the closing for the Ciceron Loan had not taken place.

Broward acted as the closing agent in connection with the Ciceron Loan. (RMST Ex. 18). On June 21, 2000, Broward received from Island Mortgage a closing package for the Ciceron Loan, which included a check issued by David Duboff, P.C. in the sum of $77,216.88 drawn on the

---

**3.** JRMK is defined as JRMK Co., Inc., doing business as CMP Mortgage, Inc.. Pursuant to an Assignment and Assumption Agreement dated January 5, 2000, JRMK assigned all of its right, title and interest in and to a Mortgage Purchase Agreement with RMST and a promissory note dated December 24, 1998 renewed by RMST to Island Mortgage.

attorney trust account of David Duboff, P.C. at State Bank of Long Island (the "Duboff Check"). The Duboff Check was payable to Broward and dated June 21, 2000. (Broward Ex. 41, RMST Ex. 25). The Duboff check, which was not certified, represented the loan proceeds for the Ciceron Loan. (Broward Ex. 35). On the same date, Broward also received from Island Mortgage "Funding Instructions," "Closing Instructions and Information" and related documents (collectively with the Duboff Check, the "Ciceron Closing Package"). (Broward Ex.28). The Funding Instructions state that "no funds are to be disbursed until a funding number is received. Funding number (sic) are given on the date of the closing (refinances and purchases)." The Funding Instructions further state that "all funding numbers are to appear on the lower left hand corner of all disbursement checks." The Funding Instructions do not contain a requirement that the funding number be placed on the loan proceeds check provided to Broward by Island Mortgage, National Settlement or David Duboff, P.C.A. funding number would not be provided by Island Mortgage until Broward faxed to Island Mortgage a signed HUD–1 settlement statement, a signed promissory note and a signed mortgage, among other items (Broward Ex. 28, Trial Tr. July 23 at 44).

On June 22, 2000, the closing of the Ciceron Loan took place. Island Mortgage had assigned a loan number to the mortgage (the "Ciceron Mortgage"), and the loan number appeared on the loan documents. At the closing of the Ciceron Loan, Simaye Ciceron executed a note (the "Ciceron Note") in the amount of the mortgage loan, $82,400. (RMST Ex. 17). Simaye Ciceron and Shirley Brown executed the Ciceron Mortgage pledging the real estate purchased as collateral for their performance pursuant to the Ciceron Note. Pursuant to the Funding Instruc-

tions, Broward faxed the Ciceron Note, the Ciceron Mortgage and the HUD–1 settlement statement to Island Mortgage and obtained a funding number for the transaction. Broward also issued a check drawn on the Broward Title Funding Account to disburse funds from its Funding Account to the seller for the Ciceron Loan. (Matrix Ex. E, Broward Exs. 36, 37).

Broward sent the original Ciceron Note by Federal Express to RMST. (RMST Ex. 22). As was the practice of Broward, an employee of Broward placed the Duboff Check in the closing folder maintained by Broward for the Ciceron Loan where it remained until after the closing. (Matrix Ex. E). The funding number was written on the Duboff Check, and Broward deposited the Duboff Check in its account with a deposit slip dated June 23, 2000, one day after the closing took place. (Broward Exs. 35, 41). Thereafter, RMST recorded an assignment of the Ciceron Mortgage by utilizing a power of attorney given to it by Island Mortgage. At all relevant times after the Ciceron closing, RMST was in possession of the Ciceron Note. Payment of the Duboff check was stopped and no funds were ever received by Broward Title to reimburse it for the money it disbursed in connection with the Ciceron Mortgage. (Broward Ex. 41).

### Amarante Note and Ciceron Note

Both the Amarante Note and the Ciceron Note are identical except for the amount of the monthly principal and interest payments to be made by the borrowers. They provide, in part:

2. BORROWER'S PROMISE TO PAY; INTEREST

In return for a loan ... Borrower promises to pay ... plus interest, .... Interest will be charged on unpaid principal, from the date of disbursement of the loan proceeds by

Lender, at the rate of nine percent (9.000 %) per year until the full amount of principal has been paid.

4. MANNER OF PAYMENT

\* \* \* \* \* \*

(A) Time

Borrower shall make a payment of principal and interest to Lender on the first day of each month beginning on [specified date]. . . .

(B) Place

Payment shall be made at . . . Melville, New York. . . .

(C) Amount

Each monthly payment of principal and interest will be in the amount of $663.01.[4] This amount will be part of a larger monthly payment required by the Security Instrument [defined in ¶ 3 as the mortgage], that shall be applied to principal, interest and other items in the order described in the Security Instrument.

\* \* \* \* \* \*

6. Borrower's Failure to Pay

(A) Late Charge for Overdue Payments

If Lender has not received the full monthly payment required by the Security Instrument, as described in Paragraph 4(c) of this Note, by the end of fifteen calendar days after the payment is due, the Lender may collect a late charge in the amount of FOUR percent (4.0000%) of the overdue amount of each payment.

\* \* \* \* \* \*

The "larger monthly payment required by the Security Instrument" in the Amarante Loan is $1,279.41; in the Ciceron Loan it is $935.39.

*Amarante Mortgage and Ciceron Mortgage*

Both the Amarante Mortgage and the Ciceron Mortgage contain the following language:

This Security Instrument secures to Lender: (a) the repayment of the debt evidenced by the Note, with interest, and all renewals, extensions and modifications; (b) the payment of all other sums, with interest, advanced under paragraph 6 to protect the security of this Security Instrument; and (c) the performance of Borrower's covenants and agreements under this Security Instrument and the Note.

\* \* \* \* \* \*

UNIFORM COVENANTS

1. Payment of Principal, Interest and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and late charges due under the Note.

2. Monthly Payment of Taxes, Insurance, and Other Charges. Borrower shall include in each monthly payment, together with the principal and interest as set forth in the Note and any late charges, a sum for (a) taxes and special assessments levied or to be levied against the Property, (b) leasehold payments or ground rents on the Property, and (c) premiums for insurance required under Paragraph 4. . . . [T]hese items are called the "Escrow Items" and the sums paid to Lender are called "Escrow Funds."

\* \* \* \* \* \*

---

**4.** This amount is for the Ciceron Note. The amount is $964.75 for the Amarante Note.

The Escrow Funds are pledged as additional security for all sums secured by this Security Instrument.

(Matrix Ex. N, RMST Ex. 18).

## Discussion

### Holder in Due Course

■ Broward and RMST are asserting conflicting claims to the sale proceeds from the Ciceron Note, and Broward and Matrix are asserting conflicting claims to the sale proceeds from the Amarante Note. Although there are slight variations in the facts between each of the transactions in question, the salient facts are sufficiently similar to treat RMST and Matrix in the same discussion as to certain issues. Both Matrix and RMST have asserted the defense that as holders in due course of the respective notes, they are entitled to the sale proceeds from the notes. The holder in due course doctrine is a creature of the Uniform Commercial Code (the "UCC"). As such, this Court must determine which state's UCC governs each of the transactions. In both transactions, New York law applies because the mortgage notes in question are payable in New York. *Beadall v. Moore,* 199 A.D. 531, 191 N.Y.S. 826 (1st Dept.1922); *Connor v. Elliott,* 79 Fla. 513, 85 So. 164 (1920). RMST and Matrix have the burden of proving that they are holders in due course of the notes in question. *FDIC v. Giammettei,* 34 F.3d 51 (2nd Cir. 1994).

■ Under the holder in due course doctrine, a party who purchases a negotiable instrument can "cut off" the rights of parties claiming an equitable interest in the negotiable instrument under certain circumstances. UCC § 3–305. Therefore, Broward's claims in and to the sales proceeds of the Amarante and Ciceron Notes and Mortgages, which all sound in equity, would be defeated as a matter of law by a holder in due course of the notes and mortgages in question.

In order to qualify as holders in due course, both RMST and Matrix must establish by a preponderance of the evidence that they are:

1) holders;

2) of negotiable instruments;

3) who took the notes for value;

4) in good faith; and

5) without notice of any defense against the notes or any claims to the notes on the part of another. N.Y. UCC § 3–302(2) (McKinney 1993). To be "negotiable" under the N.Y. UCC, an instrument must (1) "be signed by the maker or drawer," (2) "contain an unconditional promise or order to pay a sum certain in money and no other promise, order, obligation or power given by the maker or drawer except as authorized by [NY UCC Article 3]," (3) "be payable on demand or at a definite time," and (4) be payable to the payee's "order" or to the instrument's "bearer." NY UCC § 3–104(1).

■ Broward admits that there is no issue that both the Ciceron Note and the Amarante Note meet the requirements under subparts (1), (3) or (4) above. However, Broward asserts that the Ciceron Note and the Amarante Note do not contain an unconditional promise or order to pay a sum certain in money and no other promise. NY UCC § 3–105 provides that "(2) A promise or order is not unconditional if the instrument (a) states that it is subject to or governed by any other agreement; ..." The Official Commentary to N.Y. UCC states:

8. Paragraph (a) of subsection (2) retains the generally accepted rule that where an instrument contains such language as "subject to terms of contract between maker and pay-

ee of this date," its payment is conditioned according to the terms of the agreement and the instrument is not negotiable. The distinction is between a mere recital of the existence of the separate agreement or a reference to it for information, which under paragraph (c) of subsection (1) will not affect negotiability, and any language which, fairly construed, requires the holders to look to the other agreement for the terms of payment. The intent of the provision is that an instrument is not negotiable unless the holder can ascertain all of its essential terms from its face. In the specific instance of rights as to prepayment or acceleration, however, there may be a reference to a separate agreement without destroying negotiability. [As amended 1962].

Applicable case law indicates that there is no *per se* rule in New York, and each note is to be scrutinized to determine whether the note fits within the description of a negotiable instrument under the relevant UCC provisions. *Enoch v. Brandon,* 249 N.Y. 263, 267 164 N.E. 45, 47 (1928); *Felin Associates, Inc. v. Rogers,* 38 A.D.2d 6, 9, 326 N.Y.S.2d 413 (1st Dep't 1971); *First National Bank v. Valentine,* 62 Misc.2d 719, 720, 309 N.Y.S.2d 563, 564 (Sup.Ct. Nassau Co.1970); *Gramatan v. D'Amico,* 50 Misc.2d 233, 234, 269 N.Y.S.2d 871, 872 (Sup.Ct. Suffolk Co.1966).

NY UCC § 3–119 states that the existence of "a separate agreement does not affect the negotiability of an instrument." Official Comment 1 to § 3–119 indicates that "the separate writing is most commonly an agreement creating or providing for a security interest such as a mortgage, chattel mortgage, conditional sale or pledge."

The test to employ in this case is whether the notes in question contain an unconditional promise to pay a sum certain which can be determined from the face of the notes, or whether the language of the notes, fairly construed, require one to look outside the notes to determine terms of repayment. The Court finds that the Ciceron Note and the Amarante Note are negotiable instruments as defined by N.Y. UCC § 3–104. Furthermore, the references to the collateral mortgages in the Ciceron Note and the Amarante Note do not destroy the notes' negotiability pursuant to N.Y. UCC § 3–105.

Neither the Amarante Note nor the Ciceron Note contains language that the notes are "governed by" or "subject to" the relevant mortgages. In addition, the terms of each note clearly spells out the dollar amount owed by the borrowers under each note and a sum certain is included in each note. It is true that both of the notes refer to a larger amount which will be owed pursuant to the applicable mortgages, but those additional amounts would not lead the holders of the notes to believe that because of something contained in the relevant mortgages, the note holders might be precluded from collecting the amounts due under the notes themselves. The terms contained in the mortgages in question (i.e., provisions for taxes and insurance) are meant to provide additional security to the mortgage holders, not to restrict in any way the right to receive payment pursuant to the notes.

Applicable case law supports this interpretation of the Ciceron and Amarante Notes and Mortgages. In the case of *Enoch v. Brandon,* the Court of Appeals of New York held that a determination of negotiability of a note or bond is determined by relevant law, not by whether the parties intended the instrument to be negotiable or whether the instrument states

on its face that it is negotiable. 249 N.Y. at 266, 267, 164 N.E. at 47. In *Enoch v. Brandon,* the Court of Appeals was called on to interpret the predecessor to N.Y. UCC §§ 3–104, 3–105 and 3–119 in determining whether coupon bonds were negotiable instruments. The bonds contained a promise to pay the bearer at a certain time. The bonds further stated that they were "equally secured by and entitled to the benefits and subject to the provisions" of the trust mortgage. The bonds referred to the trust mortgage "for a description of the property mortgaged and pledged, the nature and extent of the security, the rights of the holders of the bonds with respect thereto, the manner which notice may be given to such holders and the terms and conditions under which said bonds are issued and secured." 249 N.Y. at 266, 164 N.E. at 47. The Court of Appeals found that the language set forth in the bonds related only to the security and did not render the promise to pay conditional. According to the Court of Appeals, it was clear that these provisions related solely to security and did not threaten the unconditional nature of the promise to pay contained in the bonds. 249 N.Y. at 269, 164 N.E. at 47.

Likewise, the references in the Ciceron Note and the Amarante Note to the Ciceron Mortgage and Amarante Mortgage, respectively, do not threaten to render the payment terms under the notes conditional in some way. These references only serve to notify the borrowers that the mortgages provide the lenders with additional security.

In the case of *First National City Bank v. Valentine,* 62 Misc.2d 719, 309 N.Y.S.2d 563 (Sup.Ct. Nassau Co.1970), the court was faced with determining whether a reference in a promissory note to a collateral mortgage constituted a qualification of the unconditional promise to pay a sum certain

set forth in the note. The court found that the reference to the mortgage did not destroy the negotiability of the note and that the purpose of the reference to the mortgage was to add additional provisions for the security of the holder. 62 Misc. at 720, 115 N.Y.S. 1090. Other New York case similarly hold that promissory notes issued in conjunction with a mortgage are negotiable instruments. *Gramatan v. D'Amico,* 50 Misc.2d 233, 234, 269 N.Y.S.2d 871, 872 (Sup.Ct. Suffolk Co.1966); and *Slutsky v. Blooming Grove Inn, Inc.,* 147 A.D.2d 208, 542 N.Y.S.2d 721, 723 (2d Dep't 1989).

Cases holding that a note given in connection with a mortgage in a real estate transaction is not a negotiable instrument either turn on facts different from the facts in this adversary proceeding or do not contain sufficient facts for this Court to examine. For example, in *Felin Assocs. v. Rogers,* 38 A.D.2d 6, 326 N.Y.S.2d 413 (1st Dep't 1971), the court provided no details concerning the subject note, but held that such a note is not a negotiable instrument in the context of whether a mortgagee's offer to deliver a replacement note together with a lost note affidavit complied with the requirements of New York Real Property Law § 275. In addition to this comment, the court stated; "Certainly, absent affirmative proof this Court is not and should not be required to presume that the note was negotiable." *Felin Assocs.,* 326 N.Y.S.2d 413 at 415. Therefore, the court in the *Felin Assocs.* case kept open the prospect that a note given in connection with a mortgage in a real estate transaction could fall within the definition of a negotiable instrument.

In *United States v. Bowman Poultry Farms, Inc.,* 1994 WL 577524 (W.D.N.Y.), the court mentioned in a footnote that the notes and mortgage at issue in that decision both contained "numerous promises not authorized by article 3." Therefore, the

notes were not negotiable instruments and Article 3 of the UCC did not govern the transaction in question. The *Bowman Poultry Farms* case does not include a description of the notes in question and is therefore of little value, especially since the Amarante Note and the Ciceron Note do not contain "numerous promises" by any reasonable interpretation. Likewise, the last case cited by Broward, *P & K Marble, Inc. v. LaPaglia,* 147 A.D.2d 804, 537 N.Y.S.2d 682 (3d Dep't 1989), contains facts which are distinguishable from the facts of this case. In the *P & K Marble* case, the document in question was a combined note and mortgage which contained terms normally included in a mortgage. These additional terms rendered the document nonnegotiable, but this case does not apply to the facts before this court where the instruments at issue are the Amarante Note and the Ciceron Note. The references contained in the Amarante Note and the Ciceron Note to the respective mortgages do not destroy the negotiability of the notes under the clear terms of the UCC and under relevant case law.

Finally, the reference in the Amarante Note and the Ciceron Note to the date of disbursement of the loan proceeds does not render the notes non-negotiable because the amount payable under the notes can be calculated within the four corners of the notes. The principal amount is provided, and the interest rate is fixed.

Having determined that the Amarante Note and the Ciceron Note are negotiable instruments, the Court must next examine whether Matrix and RMST were holders in due course of the notes in question before delivering the notes to the Trustee for sale in these Chapter 11 proceedings. In order to maintain the status of holders in due course of the Amarante Note and the Ciceron Note, Matrix and RMST, respectively, must each affirmatively establish that 1) at all relevant times, they were in possession of the notes in question, 2) Matrix and RMST acquired their interests in the notes in question for value, 3) in good faith, and 4) without notice of Island Mortgage's fraud or Broward's claim to the note. *See* N.Y. UCC § 3–302(1). The fact that the parties have stipulated that for the purposes of this adversary proceeding, Matrix and RMST have unavoidable security interests in and to the Amarante Note and the Ciceron Note, respectively, does not harm their claims that they took the notes in question for value. UCC § 3–303 provides that a holder takes an instrument for value:

(a) to the extent that the agreed upon consideration has been performed or that he acquires a security interest in or a lien on the instrument otherwise than by legal process; or

(b) when he takes the instrument in payment of or as security for an antecedent claim against any person whether or not the claim is due.

*See also, Swiss Credit Bank v. Chemical Bank,* 422 F.Supp. 1305, 1310 (S.D.N.Y. 1976) (lender who took notes as security for outstanding line of credit was a holder in due course); *Budget Fin. Corp. v. Bernstein,* 42 A.D.2d 893, 894, 347 N.Y.S.2d 593, 595 (1st Dep't 1973), *aff'd,* 35 N.Y.2d 761, 362 N.Y.S.2d 147, 320 N.E.2d 864 (1974) (plaintiff, who received promissory notes as security for payment of a separate loan, was a holder in due course). Clearly, as the parties have stipulated that RMST and Matrix are to be treated as if they had perfected security interests in and to the Ciceron Note and Amarante Note, respectively, RMST and Matrix have met their burden of proof on this prong of the test. In addition, there is no challenge to the fact that RMST and Matrix paid valuable consideration to Island for these notes and mortgages.

■ Under N.Y. UCC § 3–302(1)(b), "good faith" "requires honesty only. It does not require the exercise of due care." *Bank of N.Y. v. Welz*, 118 Misc.2d 645, 460 N.Y.S.2d 867, 870 (Sup.Ct. N.Y. County 1983). Good faith turns on what the holder actually knew of the transaction in question. *Regent Corp., U.S.A. v. Azmat Bangladesh, Ltd.*, 253 A.D.2d 134, 686 N.Y.S.2d 24, 29 (1st Dep't 1999). "Constructive knowledge is insufficient and it is irrelevant what a reasonable [person] in [RMST's and Matrix's] position should have known or should have inquired about." *Id.* (Citing *Chem. Bank of Rochester v. Haskell*, 51 N.Y.2d 85, 432 N.Y.S.2d 478, 480, 411 N.E.2d 1339 (1980)). Therefore, even if RMST and Matrix harbored suspicions about certain of Island Mortgage's practices[5], and a prudent warehouse lender would have undertaken more due diligence regarding Island Mortgage and Action Abstract, their failure to do so does not defeat their claim of good faith in this adversary proceeding.

■ UCC § 3–304(7) states that "to constitute notice of a claim or defense, the purchaser must have notice of the claim or defense or knowledge of such facts that his action in taking an instrument amounts to bad faith." Under New York law, a subjective test is employed to determine whether a holder has notice of a claim or defense. *Fortunoff v. Triad Land Assocs.*, 906 F.Supp. 107, 113 (E.D.N.Y.1995) (citing *Indyk v. Habib Bank, Ltd.*, 694 F.2d 54, 56 (2d Cir.1982)). The existence of "suspicious circumstances" does not constitute notice. *Id.* (other citations omitted). At the time it received the Ciceron Note and Ciceron Mortgage, RMST had no knowledge or notice of any claims or defenses against the enforcement of the Ciceron Note or the Ciceron Mortgage. (Trial Tr. August

28 at 154). Likewise, at the time Matrix purchased the Amarante Note and Amarante Mortgage, Matrix had no actual knowledge that Island Mortgage would fail to finance the transaction and Broward would end up funding the transaction. Any knowledge Matrix had of Island Mortgage's irregularities in its relationship with Matrix to that point is insufficient to defeat Matrix's claim of lack of notice.

Clearly, both RMST and Matrix took the notes in question for value, in good faith, without actual knowledge of either Broward's equitable claims or Island Mortgage's failure to fund the loans in question. Therefore, RMST and Matrix qualify as holders in due course of the Ciceron Note and the Amarante Note, respectively. As holders in due course of these notes, Matrix and RMST take the mortgages in question as they take the notes, "free from the objection to which it was liable in the hands of the mortgagee." *Carpenter v. Longan*, 16 Wall. 271, 83 U.S. 271, 273, 21 L.Ed. 313 (1872). *See also Gramatan Co. v. D'Amico*, 50 Misc.2d 233, 269 N.Y.S.2d 871, 873 (Sup.Ct. N.Y. County 1966) (holder in due course of negotiable promissory note that is secured by a mortgage "has taken the mortgage itself free of all defenses and claims not available against the note itself."); *Weaver Hardware Co. v. Solomovitz*, 98 Misc. 413, 163 N.Y.S. 121, 130–31 (Sup.Ct. N.Y. County 1917) ("The bona fide purchaser before maturity of a promissory note secured by a mortgage takes the mortgage, as he takes the note, free from any equities which existed in favor of third parties while it was held by the mortgagee."). Therefore, RMST and Matrix hold the Ciceron Note and Ciceron Mortgage and the Amarante Note and Amarante Mortgage, respectively, free of

---

**5.** There is no evidence that they had any    suspicions.

any claims or defenses to it on the part of Broward and free of any claims of a property or possessory right to the notes in question by Broward. NY UCC §§ 3–305 and 3–306.

### Applicability of Article 9 of the UCC

■ Given that RMST and Matrix are deemed holders in due course of the notes and mortgages in question, the Court need not consider the remaining arguments or defenses raised by any of the parties. However, the parties have raised the applicability of Article 9 of the UCC to these transactions in question. Under the UCC, a "security interest" means an interest in personal property or fixtures, which secures payment or performance of an obligation. Article 9 of the UCC applies where a note and mortgage are the collateral pledged to secure performance of an obligation. *See In re Churchill Mortgage Inv. Corp.*, 233 B.R. 61, 70 (Bankr. S.D.N.Y.1999) (citing UCC § 9–102(2)). Because the Ciceron Note and Ciceron Mortgage were assigned to RMST and the Amarante Note and Amarante Mortgage were assigned to Matrix to secure Island Mortgage's obligation, RMST and Matrix have security interests in the Amarante Loan and the Ciceron Loan, respectively. Section 9–304 of the UCC provides, in relevant part, that a "security interest in money or instruments (other than certified securities or instruments which constitute part of chattel paper) can be perfected [ ] by the secured party's taking possession." UCC § 9–304(1). It is undisputed that RMST and Matrix had possession of the notes in question and therefore had perfected security interests in the mortgages in question. However, this has no bearing on RMST and Matrix's status as holders in due course of the notes and mortgages in question.

■ Broward raises potential defenses to RMST's and Matrix's perfected security interests in the relevant mortgages, in particular UCC § 9–318 for the proposition that Matrix and RMST can only claim a perfected security interest in the mortgages to the extent that Island Mortgage can claim an interest in the notes and mortgages in question. UCC § 9–318 states that the rights of an assignee are subject to:

(a) all the terms of the contract between the account debtor and assignor and any defense or claim arising therefrom; and

(b) any other defense or claim of the account debtor against the assignor which accrues before the account debtor receives notification of the assignment.

However, without addressing whether Broward can assert the defenses of the mortgagees, these defenses do not abrogate RMST's and Matrix's standing as holders in due course of the notes in question. Therefore, Article 9 of the UCC is not pertinent to this Court's analysis.

It is axiomatic that the holder in due course doctrine serves to encourage beneficial commercial transactions by making banks more willing to purchase notes on the secondary mortgage market. Gregory E. Maggs, *The Holder in Due Course Doctrine as a Default Rule*, 32 Ga. L.Rev. 783 (1998). Negotiability of notes such as the Amarante Note and the Ciceron Note is in "the national interest in keeping commercial paper flowing." The holder in due course doctrine helps to promote fairness by ensuring that liability is allocated to the party best able to prevent the loss. *Thaler v Lee Servicing Corp. (In re Joe Sipala & Son Nursery Corp.)*, 214 B.R. 281, 291 (Bankr.E.D.N.Y.1997).

In this case, Broward was in a position to ascertain that the funds delivered by

Island Mortgage, Action Abstract or David Duboff, P.C. were good funds.

Although this Court believes that Broward acted in good faith without any intent to adversely affect anyone's rights, Broward has unfortunately harmed itself.

Without having good funds wired to it, or checks representing the funders payment to it cleared by a bank before it disbursed funds, it took the risk that any disbursement from its escrow account prior thereto could result in Broward sustaining a loss.

The fact that Broward and the Debtor established a course of conduct where these checks were not deposited until after the closing did not insulate Broward from the claims of RMST and Matrix as holders in due course. As a result of these findings, all of Broward's equitable claims against RMST and Matrix are dismissed.

### Conclusion

1. The Amarante Note, which was prepared by and endorsed in blank by Island Mortgage is a negotiable instrument. Because Matrix was continuously in possession of the original Amarante Note from the time of its receipt from Broward until the Amarante Note was sold pursuant to an order of this Court, Matrix is a holder of the Amarante Note. Matrix took the Amarante Note for value, in good faith and without knowledge or notice or any claims or defenses against enforcement of the Amarante Note or the Amarante Mortgage.

2. Matrix is a holder in due course of the Amarante Note and Amarante Mortgage.

3. Broward's equitable claims to the proceeds of the sale of the Amarante Note and Amarante Mortgage are defeated by Matrix's status as holder in due course.

4. Broward's claims against Matrix are dismissed and judgment shall be entered in favor of Matrix on its counterclaims. Matrix is to settle a judgment on Broward pursuant to this Order.

5. The Ciceron Note, which was prepared by and endorsed in blank by Island Mortgage is a negotiable instrument. Because RMST was continuously in possession of the original Ciceron Note from the time of its receipt from Broward until the Ciceron Note was sold pursuant to an order of this Court, RMST is a holder of the Ciceron Note. RMST took the Ciceron Note for value, in good faith and without knowledge or notice or any claims or defenses against enforcement of the Ciceron Note or the Ciceron Mortgage.

6. RMST is a holder in due course of the Ciceron Note and Ciceron Mortgage.

7. Broward's equitable claims to the proceeds of the sale of the Ciceron Note and Ciceron Mortgage are defeated by RMST's status as holder in due course.

8. Broward's claims against RMST are dismissed and judgment shall be entered in favor of RMST on its first and third counterclaims. RMST is to settle a judgment on Broward pursuant to this Order.

**SO ORDERED.**